**EXECUTIVE BUSINESS SYSTEMS, INC., Trading as Executive Communication Systems, Plaintiff,**

**v.**

**PHILIPS BUSINESS SYSTEMS, INC., Defendant.**

**No. CV 81 2075.**

United States District Court, E. D. New York.

Jan. 14, 1982.

weight.

Emmet, Marvin & Martin, New York City, for plaintiff; Dennis C. Fleischmann, New York City, of counsel.

Ribis, McCluskey & Sweeney, Short Hills, N.J., for defendant; Nicholas L. Ribis, Short Hills, N.J., Gifford, Woody, Palmer & Serles and John T. Morin, New York City, of counsel.

## DECISION AND ORDER

BRAMWELL, District Judge.

## INTRODUCTION

Plaintiff Executive Business Systems, Inc., ("Executive") has moved this Court for an Order adjudging defendant Philips Business Systems, Inc., ("PBSI") to be in contempt of a preliminary injunction entered against it on July 30, 1981. This is an action with which the Court is rather famil-iar but which nevertheless presents some-times complex and confusing issues.

Essentially, the action involves an attempt by defendant to discontinue a business relationship with plaintiff which may be in contravention of the New Jersey Franchise Practices Act. See N.J.Stat.Ann. § 56:10–1 et seq. (West Supp. 1980–81). Pursuant to a July, 1978 agreement, the parties agreed that plaintiff would be the exclusive distributor of Norelco office products in eight northern New Jersey counties until June 30, 1981. In response to the attempted termination, the Court, on July 30, 1981, entered a preliminary injunction upon a finding that plaintiff had made a sufficient showing of irreparable harm and likelihood of success on the merits.[1] The injunction prohibits defendant PBSI from:

(1) cancelling, terminating, or otherwise amending the Distributor Agreement dated July 1, 1978 between the plaintiff and the defendant (the "Agreement")
(2) communicating with, interfering with or taking any other action which could in any way adversely affect the present or potential relationship between the plaintiff and any person or entity now or about to be engaged in buying, selling or dealing in any product or products covered or coverable under the Agreement including, but not limited to:

Arrowhead Business Machines
4702 Eastern Avenue
Kansas City, Missouri 64129
Executive Business Machines
17–11 Broadway
Fair Lawn, New Jersey 07410
Fredericks Typewriter Co.
1206 Highway 35
Asbury Park, New Jersey 07712
Harry Strauss & Sons
429 Jersey Avenue
New Brunswick, New Jersey 08903
International Dictation Equipment

---

1. The action was commenced on June 26, 1981. On that date the Court entered a temporary restraining order which was continued up and until the time the preliminary injunction was entered on July 30, 1981. The injunction was issued after the entry by the Court of findings of fact and conclusions of law. Grant of the injunction was affirmed by the U.S. Court of Appeals for the Second Circuit on November 27, 1981. Reference is made to those findings for additional background.

125 Wilbur Place
Bohemia, New York 11716
Kimber Business Machines
514 Georges Road
North Brunswick, New Jersey 08902
Matthijssen
14 Rt. 10 at Ridgedale
E. Hanover, New Jersey 07936
Office Control Systems
264 Osborne Road
Albany, New York 12211
Shanahans
28 West Main Street
Somerville, New Jersey 08876
Systems 3
2324 University Avenue
St. Paul, Minnesota 55114
Trademark Office Products
2414 Broadway
Fairlawn, New Jersey 07410
Universal Business Machines
72 Park Avenue
Park Ridge, New Jersey 07656
Worldwide Merchandise Ltd.
147 South Franklin Avenue
Valley Stream, New York 11582

(3) notifying or deliverying to any of the persons or entities described in (2) above any proposed franchise, contract, agreement, license, concession or any other arrangement relating to buying, selling or dealing in any·product or products covered or coverable under the Agreement; and

It goes on to direct defendant to

(4) continue or renew the Agreement on the same term and conditions, and to fully comply therewith.

Plaintiff, via an order to show cause dated November 24, 1981, has moved this Court for an Order adjudging PBSI in contempt.

As a basis for this, plaintiff alleges that defendant, in wilful disregard of the Court's Order, engaged in the following practices:

(1) the defendant's attorney has communicated with Worldwide Merchandise Ltd. and Arrowhead Business Machines, customers of the plaintiff, seeking information and an affidavit to be used against the plaintiff in this action even though such communication with those customers was expressly prohibited by the preliminary injunction;

(2) the defendant reduced the payment terms from 60 days to 30 days and is charging the plaintiff dealer prices without the customary distributor discount to which it is entitled to as an exclusive distributor;

(3) the defendant describes and refers to the plaintiff as a dealer rather than a distributor to the plaintiff and its potential customers;

(4) the defendant has refused to accept returns of unsold equipment from the plaintiff, contrary to their custom and practice for nearly 10 years;

A hearing was held on December 3, 1981 at which Mr. Charles J. McGuire, the Vice President of plaintiff, and Messrs. Arthur L. Hanrahan and Paul B. Dentone, the President and Executive Vice President of defendant testified. The parties have also submitted proposed findings of fact and conclusions of law in support of their respective positions. For reasons to be set forth herein the Court finds that plaintiff's application is granted to the extent defendant has committed three of the four alleged acts of contempt.[2]

---

**2.** Plaintiff originally asserted that defendant had instigated Mr. Guy DePastino of D&R Word Processing Systems, the Norelco distributor for Southern Connecticut, to solicit sales in plaintiff's primary area of responsibility. As a result of the deposition of Mr. DePastino taken on November 30, 1981, plaintiff has withdrawn this charge. Submitted along with plaintiff's proposed findings is an affidavit of Mr. Charles J. McGuire. Basically it levels a charge that defendant had instigated a similar type of invasion in plaintiff's PAR by A.L.A., a Norelco dealer located in Rochester, New York. Defendant has submitted a responsive memorandum and affidavits. Because the Court feels that the record on this point is insufficiently developed at this point it reserves decision to a later date and expresses no opinion on it at this time.

## DISCUSSION [3]

### CONTACT WITH PLAINTIFF'S CUSTOMERS

Firstly, plaintiff contends that counsel for defendant, by contacting two of plaintiff's customers, is in contempt of Section Two of the Court's preliminary injunction. *See* plaintiff's Order to Show Cause for Contempt, filed November 24, 1981.

Section Two provides that defendant, as well as its agents, officers, and *attorneys* are enjoined from:

(2) communicating with, interfering with or taking any other action which could in any way adversely affect the present or potential relationship between the plaintiff and any person or entity now or about to be engaged in buying, selling or dealing in any product or products covered or coverable under the Agreement including, but not limited to:

It goes on to list a group of such customers among whom Arrowhead Business Machines of Kansas City, Missouri and Worldwide Merchandise Ltd. of Valley Stream, New York are listed.

Notwithstanding this explicit mandate, counsel for defendant, in August of 1981 contacted the latter two customers with the avowed purpose of procuring from them affidavits detailing their business relationship with plaintiff. (8–11; Pl. Ex. 1 and 2). He advised the customers that the affidavits were to be used in connection with the instant litigation. (5–6; D.F. 13–19).

Counsel for defendant does not contest plaintiff's allegations on this point but rather indicates that the communications were undertaken not by defendant but by him and that in any event they were undertaken solely for the purpose of preparing his case (5–6; D.F. 13, 15, 16, 19). He goes on to cite his agreement with plaintiff's counsel to discontinue the practice in view of the latter's strenuous objection to it. (162–163;

D.F. 17; Pl. Ex. 2). In this Court's opinion counsel for defendant seeks to put a distance between himself and PBSI which is inconsistent with the attorney client relationship that they have. Moreover, the Court does not view in so isolated a light the potentially damaging impact that such communications can have.

■ It is quite elementary that an attorney stands in the shoes of an agent in his dealings with third parties on behalf of his principal, the client in this case. *Davis v. United Fruit Co.,* 402 F.2d 328 (2d Cir. 1968). Therefore, any attempt to insulate his client from the effects of what he does must fail. *Id.* at 231. With respect to defendant's counsel's characterization of the communications as being undertaken as part of discovery, the Court acknowledges that non party witnesses under ordinary circumstances are indeed fair game in discovery. Where however, these persons are specifically enumerated in a preliminary injunction and the attorney is also so enumerated a different situation is presented.

■ In this latter situation, the Court's directive is specifically designed to prevent any alteration in the business relationship between plaintiff and one of its customers so as to maintain the *status quo ante.* In pursuit of this, the Court's order in this case was drafted to avoid any such contacts by anyone, including an attorney "which could *in any way* adversely affect" such relationships. It is hard to imagine how an experienced attorney such as defendant's could fail to understand the intended import of such a clear directive.

Indeed, the record reveals that plaintiff has not done any business with Worldwide Merchandise since the contact. (11–12). And while this downturn at this point cannot be specifically attributed to the calls, the possibility that it can and did is at least a very real possibility that cannot be overlooked in the circumstances of this case.

3. The number in parentheses denotes reference to the transcript of the hearing of December 3, 1981. "Pl. Ex." and "D. Ex." denote reference to exhibits introduced at this hearing by the respective parties. The terms "D.F.", "D.C.", and "P.F." and "P.C." denote reference to the proposed findings of fact and conclusions of law submitted by defendant and plaintiff respectively.

Defendant's contention that he has been deprived of the means to defend his client by virtue of this prohibition is also without merit. (5–6; D.F. 19). Aside from the fact that he, as PBSI's attorney, was specifically listed in the injunction, there was nothing preventing him from contacting this Court in order to determine the exact scope and parameters of the injunction. By his own admission he was unclear as to the import of this Court's directive (6). Under the circumstances he acted at his and his client's peril in proceeding to contact plaintiff's customers. Accordingly, defendant is hereby adjudged to be in contempt of Section Two of this Court's injunction of July 30, 1981.

## DISTRIBUTOR PRICE AND TERMS

■ This is an area of the dispute where the parties' varying terminology has served to distort and confuse what is essentially a rather simple proposition. It deals with the consequences to plaintiff of defendant's elimination of a bifurcated marketing system in favor of a new unitary one. By plaintiff's account, the essence of being an exclusive Norelco distributor is receiving the preferential pricing and terms as well as advertising traditionally accorded such distributors. (P.F. 23; P.C. J).

Plaintiff contends that defendant's implementation of the July 1, 1981 "National Dealer Price List" with respect to plaintiff constitutes an act of contempt on the latter's part. (15–17; D. Ex. G). Again, the Court's preliminary injunction of July 30, 1981 provides in pertinent part that the defendant is enjoined from:

(1) cancelling, terminating, or otherwise amending the Distributor Agreement dated July 1, 1978 between the plaintiff and the defendant (the "Agreement"); and is

(4) directed to continue or renew the Agreement on the same term and conditions, and to fully comply therewith.

The "Distributor Price List" of March 1, 1981 provided for prices to plaintiff which were, by its calculation, 16.6% lower than those charged the Independent Retail Outlets ("IROs") under the then existing "IRO

Price Policy Structure." (Pl. Ex. 11; D. Ex. F). The reduced prices charged the exclusive distributors, including plaintiff, were reflective of the customer service that they, unlike the IROs, provided to customers. (15–17; Pl. Ex. 10; P.F. 7).

By contrast, the pricing structure instituted by defendant as of July 1, 1981 is a uniform one with all purchasers paying the same price depending only upon the number of units of any particular product they purchase from defendant. (D.Ex.G). In any event, the prices under this new system are uniformly lower than those charged exclusive distributors under the March 1 list. (D.Ex.F). Included in the one class of purchasers under the new arrangement are the former IROs, customer dealers of the exclusive distributors such as plaintiff, as well as the former exclusive distributors themselves. (100–01; 118). By its own admission, defendant sought, via this new unitary pricing system, to eliminate the distinction between IROs, customer dealers, and exclusive distributors and thereby streamline its marketing distribution system in an attempt to "address the market place as it exist[ed]" at the time. (P. 36 of transcript of hearing of July 6, 1981; Pl. Ex. 18 introduced at that hearing). Under the new unitary system, all purchasers are charged one price per unit which is a function only of the number of units purchased. All purchasers are now referred to as "Dealers." (118–19; D.Ex.G).

It is plaintiff's contention that to the extent it can no longer purchase products from defendant at the 16.6% discount, it no longer enjoys the competitive edge that comes from being able to purchase inventory at a price substantially lower than the competition (15–17; 129; P.F. 14). This, it maintains, is one of the chief advantages of being an exclusive distributor under the March pricing system that it is currently being deprived of by virtue of defendant's noncompliance with the preliminary injunction. (*Id.*)

Defendant contends that under the July 1, 1978 agreement, it was given the unilat-

eral right to dictate price terms and that on the prior occasions where it has implemented such charges, plaintiff went along without complaint. (D.F. 20–22). It goes on to cite the dramatic increase in interest rates, selling costs, and competition in general as necessitating the new pricing structure (D.F. 25). It asserts that the new prices are in fact lower than the old ones charged Executive under the March 1 agreement. (103–05; D.F. 38). It goes on to lay particular emphasis on the fact that market forces, and not defendant's pricing policy, are ultimately responsible for any competitive advantage which plaintiff may or may not enjoy. (138–51, D.F. 45).

On this latter point, defendant would characterize any competitive advantage that plaintiff may have had before July 1, 1981 as primarily a function of the market place. (*Id.*) It reasons that even under the terms of the July 1, 1978 agreement it would have been entirely possible prior to July 1, 1981, for a dealer within Executive's Primary Area of Responsibility ("PAR") to purchase a Norelco product from another dealer or distributor outside of that PAR at prices more competitive than Executive's and that therefore the new pricing structure takes from Executive no competitive advantage that it formerly enjoyed.[4] (D.F. 43, 44). While the argument is indeed technically correct and has some surface appeal, it completely ignores the realities of the marketplace and the custom and usage between the parties through July 1, 1981. An example serves to illustrate the point.

Before July 1, 1981, Executive could purchase a Norelco Model 640 at a distributor price of $162.50 whereas an IRO could only purchase the same product at a cost of $195. (D.Ex.F; Pl. Ex. 11). Executive in turn would typically resell the unit to one of its customer dealers for $195 thereby neutralizing the threat of competition from an IRO. (Pl. Ex. 10). Defendant seems to suggest that because the possibility existed that Executive might be undersold in its PAR by another distributor, customer dealer, or IRO it did not really enjoy any competitive advantage. (141–42).

However possible this might indeed be under the July, 1978 agreement, defendant posits an unrealistic situation. As plaintiff quite correctly indicates an IRO could undersell Executive only at a substantial loss as Executive sold to its customer dealers at the same price as the IROs paid PBSI for their inventory. (P.F. 6). Therefore, an IRO would, even under the best of circumstances, have to sell such a product at a price below its cost. Similarly, a customer dealer could only undersell plaintiff at a substantial loss. On this latter point, defendant suggests that it was always possible for a customer dealer of plaintiff's to obtain inventory at a more competitive price than Executive's thereby enabling such a dealer to undersell plaintiff without sustaining a loss. (D.F. 43).

Again defendant posits a plausible but highly unlikely situation. The relationship of these parties as well as other distributors and dealers of Norelco products fails in any way to demonstrate the type of predatory and self-destructive trade practices upon which defendant premises his argument. Therefore, the Court finds no merit in defendant's contention that plaintiff has lost no competitive edge by virtue of implementation of the July 1, 1981 pricing system. He has been denied this competitive edge by virtue of being treated as any other dealer in PBSI's new distribution network.

The Court finds nothing inconsistent in the existence of this competitive edge and the defendant's acknowledged control over price and terms under the 1978 agreement. (Pl. Ex. 10; D.F. 20–22). Under this agreement defendant was indeed given such control but it is a right that must be exercised within the context of PBSI's entire distribution network. To the extent that defendant has not adjusted price so as to maintain plaintiff's competitive edge within this network, plaintiff presents a viable claim.

Plaintiff, by being compelled to purchase inventory under the new uniform National

4. Executive's PAR was comprised of eight    northern New Jersey counties.

Dealer Price List has clearly lost this competitive pricing edge. While it may be true that the new prices in any event are lower than the old distributor prices, the fact remains that plaintiff, as an exclusive distributor, no longer enjoys the 16% advantage that it enjoyed prior to July 1 and it is this fact that is of controlling significance in this Court's inquiry. Therefore, to maintain the status quo, plaintiff would have to be given the benefit of this discount over other dealers. Defendant's assertion that such a discount would elevate Executive to a superior competitive position and thereby give it a nationwide monopoly is without merit. If the injunction so elevates plaintiff it is only because defendant has diminished plaintiff's competitive position in direct contravention of the Court's injunction. Whether or not a nationwide monopoly by Executive will eventuate remains to be seen and in any case would appear to be a remote possibility. Moreover, the final adjudication of the dispute might eventually result in the termination of plaintiff's status as an exclusive distributor in a manner consistent with the New Jersey Franchise Practices Act, *supra.*

Therefore, it is the finding of the Court that to the extent that defendant is not currently giving plaintiff the traditional distributor discount it is in contempt of Sections One and Four of the Court's preliminary injunction of July 30, 1981.

TERMS

■ Before July 1, 1981, plaintiff had 60 days to pay defendant for inventory purchased. (13–15, 105–07). An IRO, on the other hand, had only 30 days in which to pay for inventory. (13–17; Pl. Ex. 11; D.Ex.F). The 60-day period accommodated the 30-day payment terms allowed Executive's customers and the 30-day terms allowed in turn by PBSI to plaintiff. The 30-day period allowed by Executive to its customers would permit an adequate period of time within which the customers could try out the Norelco products. This was one of the factors which made the Norelco product line competitive with that of other manufacturers. (13–15).

As of July 1, 1981, however, PBSI began allowing only 30-day terms in conjunction with its new pricing system. (13; 105–07; 117–18; 132). As is the case with the new pricing system itself, PBSI cites an increase in interest and selling costs as well as competition in general as necessitating the less generous terms and again points to their unilateral control over price and terms under the July, 1978 agreement. (105–06; D.F. 20, 25). Executive contends that by virtue of the tightening of defendant's credit terms, it in turn is no longer able to extend to its dealers the favorable credit terms and trial period that were traditionally advantages of being an exclusive Norelco distributor. (13–15; P.F. 23; P.C.J). To this extent, it asserts the loss of another facet of the competitive edge. (*Id.*) This Court agrees.

Again, this Court recognizes the parties' obligations and responsibilities under the 1978 agreement, but by the same token, it also recognizes the rights that arise out of it. One of these rights enjoyed by Executive was the privilege of being an exclusive distributor. The unilateral control over price and terms contemplated by the agreement was one by which PBSI could no doubt change prices, but not at the expense of the competitive advantage that plaintiff enjoyed over the customer dealers.

The record reveals that even after the entry of this Court's preliminary injunction, plaintiff was forced to resort to extraordinary measures in order to get his orders released per the 60-day terms. (19–25; Pl.Ex. 3, 4, 5). To the extent that defendant made these measures necessary it is hereby adjudged to have been in contempt of Sections One and Four of this Court's preliminary injunction.

REFERRING TO PLAINTIFF AS DEALER

■ With plaintiff's contention that defendant, in derogation of the preliminary injunction, has continued to refer to it as a dealer in the customer mailings and correspondence, this Court cannot agree. (30–32; 75–83). The record amply demonstrates that throughout the ten year history

of the parties' relationship PBSI continually referred to Executive as a dealer without objection on the latter's part. (30–32; 134–35; D.Ex.I; D.Ex.Ia). Apparently, this was done on the mutual understanding that Executive was in fact an exclusive distributor. Plaintiff would only now take umbrage because of the instant litigation. It points to the untoward effect on employee morale and customer perceptions of the company that characterization as a dealer might have. (31, 32). Plaintiff's argument here, however, collapses under its own weight.

It stands to reason that if plaintiff's customers and employees were unconcerned with the way in which defendant referred to plaintiff before July 1, 1981, there would be nothing to change that situation today. Plaintiff's argument on this point presupposes that its employees and customers are fully cognizant of the nature and consequences of litigation at hand, thereby giving them a different perspective from which to view plaintiff. The record, however, fails to demonstrate this. Plaintiff's president, himself, indicates that both he and his secretary have taken great pains to avoid letting employees find out about the litigation. (32). And while it is true that they have taken just such precautions in view of defendant's conduct, the fact remains that defendant has done nothing to alter the status quo in the Court's view. With respect to certain customers of plaintiff finding out about the litigation, the Court need only note that plaintiff has continually been referred to as a dealer by defendant over the past ten years, therefore such a customer who has recently become aware of this litigation would not necessarily attach a great deal of significance to it. It does not represent a departure from the status quo and therefore cannot serve as the predicate for a judgment of contempt. See 7 Moore's Practice ¶ 65.04[1] (2d Ed. 1973). Accordingly, the Court denies plaintiff's contempt application inasmuch as it seeks to hold defendant in contempt on this basis.

## CO–OP ADVERTISING

■ Prior to July 1, 1981, plaintiff participated in the distributor co-op yellow page advertising program. (17; D.F. 55). Pursuant to this program, plaintiff and defendant would split the cost of a yellow page advertisement which described plaintiff as an exclusive distributor under the Norelco logo (*Id.*) Subsequent to this date, defendant discontinued this program and instituted in its place a program whereby PBSI would absorb the entire cost of yellow pages advertising in which plaintiff would have been listed amongst others as an authorized representative for Norelco products. (25; D.F. 55). It is plaintiff's contention that implementation of this new advertising program deprives it of another facet of the competitive edge that it formerly enjoyed. (18; P.F. 23; P.C. J). Executive contends that by virtue of being individually described as an exclusive distributor under the distinctive Norelco logo, it enjoyed a unique and distinctive status which is diminished by virtue of the new advertising program. (18). It points to the fact that it is now listed, along with many others, under the Norelco logo. It goes on to point out that defendant, after being served with the order to show cause for contempt, finally relented and agreed to accord plaintiff its distributor advertising status. (30; Pl.Ex. 7, 8, 9).

Defendant, in opposition, relies exclusively on the fact that the co-op advertising program was an entirely voluntary one and in no way was covered under the July, 1978 agreement. (D.F. 58–59). As such, defendant contends that neither it nor plaintiff was obligated to continue its participation in the program prior to July 1, 1981 and therefore should not be required to do so today. (*Id.*)

While the Court acknowledges that the co-op program was not in fact specifically incorporated into the July 1978 agreement it also notes that this agreement is not the exclusive source from which the parties' rights and obligations spring. More specifically, the parties' course of dealing over the past ten years evidences a continuous pat-

tern of co-op advertising. Inasmuch as this is the case it cannot be overlooked as an aid in interpreting and clarifying the parties' mutual intentions and understandings under the agreement. *See* N.Y. U.C.C. § 1–205(1) (McKinney 1970 & Supp. 1982).

Accordingly, the Court finds that under the 1978 agreement the parties, in pursuit of a productive and profitable affiliation, were indeed expected to participate in the co-op yellow pages advertising program. To the extent that defendant has failed to do so it has deprived plaintiff of an important component of the competitive edge that it heretofore enjoyed and failed, until November 30, 1981, to maintain the status quo in direct violation of the Court's preliminary injunction of July 30, 1981. Accordingly, it is hereby adjudged to be in contempt of Sections One and Four of the Court's injunction on that account.

## UNSOLD EQUIPMENT

■ Prior to July 1, 1981, the defendant customarily accepted returns of products from plaintiff which fell into any of three categories. (108–09). Defendant would accept for return Norelco products which were defective and covered under the warranty, products which were ordered or shipped as a result of an administrative error of either party, and sophisticated or nonconventional products which were not readily resalable by plaintiff. (*Id.*) There seems to be some controversy between the parties over plaintiff's attempted return of products after July 1, 1981 which would arguably fall into the last of these three categories.

The record reveals that in July of 1981, one of plaintiff's customers returned to it 2 "decoder boards." Plaintiff in turn attempted to return these items to defendant but was refused. (33–34; 158–59). In a letter to plaintiff from defendant's National Sales Manager however, plaintiff was told that the "... distributor/dealer agreement does not permit [defendant] to sell equipment on consignment" and that therefore defendant would be unable to accept the returns. (Ex. F of Affidavit of Charles J. McGuire submitted in support of plaintiff's motion for contempt). Plaintiff contends that this equipment falls into the third category of merchandise which is not readily resalable and therefore should have been accepted as was the customary practice between the parties over the years. (108–09; D.F. 53). Defendant argues that the return policy remains unaltered after July 1, 1981 but nevertheless goes on to indicate that at least one of the components is not readily resalable. (108–09; D.F. 51). As to the other component, a "TTC", the record is inconclusive on the issue of resalability. Accordingly, the Court is of the opinion that PBSI was in contempt when it failed, in August of 1981, to accept for return from plaintiff the "RDY coupler", a component it concedes was in fact not readily resalable. (109).

## SPECIFICITY OF THE INJUNCTION

■ Contrary to defendant's position, this Court does not find that the Court's injunction was not sufficiently specific or definite to be complied with and therefore cannot properly form the basis for a judgment of contempt. *E.g., International Long Shoremen's Association v. Philadelphia Marine Trade Association*, 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed.2d 236 (1967); *McFarland v. United States*, 295 F. 648, 650 (7th Cir. 1933).

The Court finds incredulous defendant's assertions that it did not understand the import of the preliminary injunction. The record reveals that defendant, despite recent business reversals, is a highly successful corporation engaged in the marketing of Norelco office equipment. Furthermore, Mr. Hanrahan, the President of defendant, seems to be fully conversant with the marketing and distribution system employed both prior and subsequent to July 1, 1981. Moreover, Mr. Hanrahan, when asked directly by the Court whether or not Executive had lost the competitive edge responded, albeit recalcitrantly, as follows:

THE COURT: What I'd like to ask Mr. Hanrahan, because of the changes from July 1st on, has Executive lost a competitive edge that it enjoyed prior to July 1st?

THE WITNESS: Well, your Honor, they have testified that they believe they have, and—

THE COURT: As far as you are concerned?

THE WITNESS: Well, it's a very difficult situation for us to operate in this dual type of a thing.

If everything that Mr. McGuire is claiming, he could have lost the competitive edge.

THE COURT: Prior to July 1st they did have a competitive edge, isn't that correct?

THE WITNESS: Well, the competitive edge he's referring to, I'm not certain what he means by the competitive edge.

THE COURT: In other words, their position was such that—

THE WITNESS: The dealer sales.

THE COURT: —an IRO or someone, they definitely had a competitive edge—

THE WITNESS: Yes.

THE COURT: —or a dealer?

THE WITNESS: Yes. I would say they had a competitive edge.

THE COURT: Prior to July 1st?

THE WITNESS: Yes. But I look at McGuire and Executive earlier having a direct function to selling to direct users in their retail sales organization in addition to their dealer business.

THE COURT: I'll ask you again, subsequent to July 1st, by virtue of the position that you have taken with Executive, have they lost the competitive edge that they had?

THE WITNESS: Well, I can't answer that, because we don't have another—I can't answer that.

THE COURT: All right.

This colloquy clearly evidences a full awareness on defendant's part of the dual system that defendant employed until July 1, 1981 and the consequences to plaintiff of its discontinuance. In view of these factors, the Court finds that defendant understood full well the thrust and intent behind the Court's injunction and nevertheless acted in disregard of it.

CONCLUSION

In view of the foregoing findings, it is the position of this Court that the defendant is in contempt of the Court's preliminary injunction of July 30, 1981 to the extent set out above and that the imposition of sanctions for the dual purposes of compelling PBSI to cease and desist from treating Executive as a dealer under the July 1, 1981 arrangement and compensating it for the losses it has sustained is appropriate. *See United States v. United Mine Workers*, 330 U.S. 258, 303–04, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947); *United States v. Wendy*, 575 F.2d 1025, 1029 (2d Cir. 1978).

Executive has detailed a 77% or $53,000 decrease in its sales for the period of July 1, 1981 through August 31, 1981. In addition, it asserts that attorney fees of approximately $68,000 have been expended to date in connection with this litigation. While plaintiff concedes the difficulty of attributing an exact dollar figure to defendant's acts of contempt, it is entirely possible that the failure of Worldwide Merchandise Ltd. to do any further business with plaintiff is in some way attributable to defendant's unauthorized contact.

Under Local Civil Rule 14, this Court is empowered to award a party aggrieved by an act of contempt the damages it has suffered by virtue of such act plus reasonable attorney fees in connection with the contempt proceeding. Similarly, the New Jersey Franchise Practices Act provides for reasonable attorneys fees. *See* N.J.Stat. Ann. § 56:10–1 et seq.

ACCORDINGLY, it is hereby ORDERED that:

(1) that defendant cease and desist from the practices condemned by the Court in the instant opinion and otherwise comply in full with the Court's preliminary injunction of July 30, 1981 and;

(2) that defendant PBSI pay to plaintiff Executive the sum of $49,100 representing one-half of the business losses sustained by plaintiff during the period extending from July 1, 1981 through August 31, 1981 and one-third of the legal

fees incurred to date by plaintiff in connection with this matter.

IT IS

SO ORDERED.[5]

---

5. The Court does not hesitate to add that the crafting and implementation of the relief herein as well as the injunction itself are done in pursuit of maintaining the status quo pending a final determination which may eventuate in the termination of the parties' relationship. The Court however, expresses no opinion on this latter issue today.