PHILIPS BUSINESS SYSTEMS, INC., Plaintiff,

v.

EXECUTIVE BUSINESS SYSTEMS, INC. d/b/a Executive Communication Systems, Charles McGuire and Cornelius Fitzsimons, Defendants.

PHILIPS BUSINESS SYSTEMS, INC., Plaintiff,

v.

Don A. CARLOS, d/b/a D & S Business Systems, D & S Word Processing Systems, and Diskriter, Defendants.

Nos. 83–CV–1221, 83–CV–1222.

United States District Court, E.D. New York.

Sept. 15, 1983.

Gifford, Woody, Palmer & Serles by John T. Morin, New York City, for plaintiff.

Emmet, Marvin & Martin by Dennis C. Fleischmann, New York City, for defendants.

## DECISION AND ORDER

BRAMWELL, District Judge.

Defendants in these two antitrust actions move to dismiss the complaints pursuant to Rules 11 and 12(b)(6) of the Fed.R.Civ.Pro. as well as Section 4 of the Clayton Act, 15 U.S.C. § 15, and Section 2(f) of the Robinson-Patman Act, 15 U.S.C. § 13(f). Plaintiff sues in both cases alleging that defendants have induced and are receiving discriminatory prices in violation of foregoing antitrust statutes.[1] For reasons the court shall now set forth both motions are granted pursuant to Rule 12(b)(6).[2]

## BACKGROUND [3]

Until July of 1981 plaintiff Philips Business Systems, Inc. (PBSI) marketed the No-

---

1. Section 2(f) of the Robinson-Patman Act, 15 U.S.C. § 13(f), provides that:

    (f) It shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section.

2. The court declines any invitation to treat the motions at hand as ones for summary judgment under Rule 56. Rule 12(b)(6) authorizes a court to treat a motion made under that rule as such where "... matters outside the pleading are presented to and not excluded by the court" but goes on to condition such treatment upon the giving of "... reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed.R.Civ.Pro. 12(b). Here, the court does not feel that such opportunity has been given. In any event, courts are

well advised to grant summary judgment in antitrust cases sparingly. Clearly in cases such as these where virtually no discovery has been undertaken the grant of summary judgment would be ill-advised. *See George C. Frey Ready Mixed Concrete v. Pine Hill Concrete Mix Corp.,* 554 F.2d 551, 555 (2d Cir.1977).

3. Some of the history of the litigation thus far is also set out in detail in some of the court's prior decisions in the related franchise litigations between these parties. *Executive Business Systems v. Philips Business Systems,* (preliminary injunction, Doc. No. CV–81–2075, E.D. N.Y. July 23, 1981); *Executive Business Systems, Inc. v. Philips Business Systems, Inc.,* 539 F.Supp. 76 (E.D.N.Y.1982) (holding Philips in contempt of preliminary injunction); *Carlos v. Philips Business Systems, Inc.,* 556 F.Supp. 769 (E.D.N.Y.1983) (preliminary injunction).

relco line of office products in the United States via a marketing organization comprised of 55 exclusive distributors and 90 Independent Retail Outlets (IROs).[4] Each distributor was assigned a certain geographically defined Primary Area of Responsibility (PAR). In exchange for a distributor's pledge to meet a specified sales quota within its PAR, PBSI agreed not to compete with the distributor within its PAR directly and to refrain from appointing any other distributors within that area. Distributors assigned other PARs, however, could come in and compete in any PAR they wished. An IRO was appointed by PBSI for market coverage in an area where a distributor, for one reason or another, was no longer doing the job.

With the exception of provision of customer services, IRO's performed much the same function as PBSI's exclusive distributors and functioned under the same conditions. That function was essentially that of a market intermediary who sold products to both customer dealers on a wholesale basis and retail to final consumers or end users. To reflect their failure to provide customer service, however, the IRO's were charged higher prices for inventory purchased from PBSI. Specifically, exclusive distributors were uniformly given a 16.6% price advantage over IROs on the inventory they purchased from PBSI. In addition, distributors were given more favorable payment terms and advertising allowances than IROs. Thus, under the two-tiered system, the 55 exclusive distributors enjoyed certain distinct advantages over the 90 IROs. Chief among them, and important for our purposes today, was the better discount at which they purchased their inventory from PBSI for it gave them a significant competitive edge over IROs when it came to selling the wholesale and retail markets.

Faced with business reversals during 1979–1981 PBSI, on July 1, 1981, implemented the "National Dealer Price List" which was designed, in plaintiff's words, to "address the market place as it exist[ed]" at the time. Under it the distinctions between distributors, IRO's, and customer dealers were abrogated. In short, PBSI abandoned the two-tiered IRO/Exclusive Distributor structure in favor of one under which customer dealers, exclusive distributors and IROs all purchased from PBSI and received the same discounts, terms, and advertising allowances. In PBSI's estimation this move was designed to streamline its marketing organization in the hope of turning the business around. In response to the proposed changes, defendants Executive Business Systems and Don Carlos, both exclusive distributors of PBSI, sued to enjoin what they perceived to be attempted terminations of their businesses.

In *Executive v. PBSI,* CV–81–2075, plaintiff was successful in obtaining a preliminary injunction on July 30, 1981 pursuant to the provisions of the New Jersey Franchise Practices Act. N.J.Stat.Ann. § 56:10–10 (West Supp.1982–83). The injunction provided for PBSI's continuance of Executive as an exclusive distributor with all the benefits that accompany such status. These benefits included exclusivity within its PAR and price advantage over the IROs. On November 27, 1981 entry of the injunction was affirmed by the United States Court of Appeals for the Second Circuit.

In *Carlos* plaintiff succeeded in obtaining injunctive relief identical to that granted in *Executive* on February 16, 1983 under the same New Jersey statute as well as the provisions of the Connecticut Franchise Act. Conn.Gen.Stat. § 42–133(e) *et seq.* (West Supp.1982). *See Carlos v. Philips Business Systems Inc.,* 556 F.Supp. 769 (E.D.N.Y.1983). Unlike Executive, which did business exclusively in New Jersey, Mr.

---

4. The court rejects plaintiff's attempt to establish the existence of a third class of market intermediaries to which it sold Norelco products. Specifically, plaintiff now asserts that there existed a class of dealers which purchased Norelco products from PBSI at prices and terms identical to those received by exclusive distributors such as Carlos and Executive. It is an assertion which runs contrary to PBSI's innumerable assertions in the franchise cases that it sold *only* to 55 distributors and 90 IROs.

Carlos did business in New Jersey, Connecticut and Ohio.[5]

On November 24, 1981 plaintiff in *Executive* brought on an application for contempt of the July 30, 1981 injunction pointing to PBSI's refusal to accord it distributor price, terms, and advertising. On December 3, 1981 a hearing was held. On January 14, 1982, after receiving proposed findings of fact and conclusions of law, the court found defendant to be in contempt of the injunction to the extent it had failed to continue to give Executive its distributor discount and terms, had failed to continue the co-op advertising program, had failed to accept returns of unsold equipment per arrangements existing prior to July 1, 1981, and had made unauthorized contact to certain of Executive's customers in violation of section 2 of the injunction. As a consequence of its contempt PBSI was ordered to pay to Executive $49,100 representing a portion of the business losses and attorneys fees plaintiff had incurred as a result of defendant's contempt. *See Executive Business Systems v. Philips Business Systems,* 539 F.Supp. 76 (E.D.N.Y.1982).[6]

With respect to the distributor prices, this court, in the contempt decision, made reference to the 16.6% discount advantage vis-a-vis IROs exclusive distributors enjoyed prior to July 1, 1981 and the consequences to a distributor of losing this advantage. 539 F.Supp. 81–83. It found that making the same discount available to IROs and distributors alike would have the effect of stripping the latter of a competitive edge they had enjoyed all along both within and without their PARs. Accordingly, it found that in order to preserve the *status quo ante* July 1, 1981 and maintain plaintiff's competitive edge within the PBSI's distribution network Executive would have to be given the benefit of the 16.6% advantage it enjoyed over IROs prior to July 1, 1981—as

would Carlos in his litigation. This is a conclusion which defendant PBSI had repeatedly and unsuccessfully attacked in the franchise litigations.

Seizing on this price differential once again PBSI commenced the instant suits alleging that Executive and Carlos have illegally induced more favorable prices than the competition in violation of the Robinson-Patman Act. Specifically, PBSI alleges that *Executive* and *Carlos* now enjoy an unauthorized 16.6% discount advantage over all other distributors and IROs in the PBSI network. PBSI seeks injunctive relief as well as an award of treble damages on account of this. In this court's opinion, however, these suits represent nothing more than elaborate attempts to obtain redress for being compelled to act in accordance with the court's injunctions in the franchise litigations. As such the court is of the opinion that they should proceed no further than they have already.

STATUS QUO PRIOR TO JULY 1, 1981

■ The court begins by looking to the status of Executive and Carlos in the PBSI network prior to July 1, 1981. Under the July 1978 exclusive distributorship agreement they were each given PAR's within which PBSI agreed to appoint no other distributor or IROs and within which it agreed not to compete. As a result these distributors competed only with other distributors or IROs from around the nation that wished to come in and compete. Other such distributors could come in and compete on the basis of identical prices paid to PBSI for inventory. IROs, however, were at a distinct competitive disadvantage since they did not receive as favorable a discount on inventory from PBSI. Significantly for our purposes today PBSI does not, nor could it, allege that this arrangement was in any way discriminatory or ran afoul of the federal antitrust laws. Indeed, the difference

---

5. Although Ohio does not have a franchise act the court found protection of Mr. Carlos' business there a necessary step taken in furtherance of protection of the status quo under the New Jersey and Connecticut legislation. Entry of the injunction in that case is currently on appeal.

6. PBSI's attempt to appeal this decision was unsuccessful. The Second Circuit declined to entertain the appeal on a finding that the contempt was civil in nature and hence constituted an unappealable interlocutory order.

in prices paid to by exclusive distributors and IROs was reflective of customer services that distributors, unlike the IROs, provided customers.

Nevertheless PBSI argues again today, as it has repeatedly in the franchise litigations, that to the extent Executive and Carlos enjoy a 16.6% advantage over former *distributors* under the July 1978 agreement the status quo has been altered. The problem is a difficult one which the court considered and addressed in some depth in the *Executive* contempt decision. 539 F.Supp. at 82–83.

In that decision the court acknowledged that if the injunction in fact elevated plaintiffs to positions superior to other distributors it was due to actions taken by PBSI and not the court. It arrived at this conclusion after an evaluation of the alternatives available to it. On the one hand was a course of action which would restore these distributors' preferred status vis-a-vis the 90 IROs. Because PBSI had stripped the other 53 distributors of their exclusivity and price advantage, however, this would have the effect of elevating Executive and Carlos to a competitive position superior to that of the other 53 distributors. On the other hand, the court could maintain Executive and Carlos on a par with these distributors. In the process of doing this, however, the court would, in effect, be divesting Executive and Carlos of their competitive advantage over the IROs. In the franchise litigations the suggestion was made by PBSI that the court afford Executive and Carlos price superiority within their PARs on the condition that they do not venture beyond this area and exploit this advantage. The court rejected this alternative on a finding that this would divest these distributors of the right to compete for sales of Norelco products on a nationwide basis if they wished—a right they enjoyed under the 1978 distributor agreement. On balance, the court came to the conclusion that the preferable alternative was to reestablish, via the injunction, the relationship that existed between the only parties then before it prior to July 1, 1981. In doing so the court restored Carlos' and Executive's ex-

clusivity and preferred distributor price and terms vis-a-vis PBSI's 90 IROs. Any untoward effect on PBSI's relationship with any of its other 53 distributors was acknowledged to be a product of PBSI's efforts to modify its marketing organization and not the court's efforts undertaken in pursuit of preservation of the status quo between the parties before it. *See Delta Marina, Inc. v. Plaquemine Oil Sales, Inc.,* 644 F.2d 455 (5th Cir.1981); *Texas Gulf Sulphur Co. v. J.R. Simplot Co.,* 418 F.2d 793 (9th Cir.1969).

In sum then, the court finds itself confronted with two antitrust suits commenced solely on account of plaintiff's compliance with injunctions entered in two related franchise litigations between the same parties. They are injunctions which, as implemented, are designed and intended to restore the relationship which existed between the parties prior to July 1, 1981. As such the injunction bond rule, as enunciated in *In re Spencer Kellogg & Sons,* 52 F.2d 129 (2d Cir.1931), *rev'd on other grounds,* 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1931) and reaffirmed in *Commerce Tankers v. National Maritime Union of America,* 553 F.2d 793 (2d Cir.1977) bars the instant suits.

### INJUNCTION BOND RULE

In the *Spencer Kellogg* case the Second Circuit first addressed itself to what has now become known as the injunction bond rule. The rule provides that where a party has been wrongfully enjoined on account of another party's good faith resort to the courts the wrongfully enjoined party's sole remedy is resort to the security posted for the injunction. The *Kellogg* case involved a limitation of liability proceeding brought by the owner of a vessel which was involved in a serious boating accident. The owner initially succeeded in obtaining a preliminary injunction enjoining prosecution of suits by claimants against the vessel. The injunction, however, was eventually vacated. On appeal, the claimants argued that entry of the injunction constituted a repudiation of their employment contract with Kellogg en-

titling them to an award of money damages. After recognizing the impropriety of the injunction, Judge Learned Hand rejected the notion that Kellogg could be held legally responsible for obtaining the injunction. Writing for the court, he stated that:

It is true that the order was mistaken, but it was none the less an excuse for the breach while it stood. It was the court, not the company, which prevented the claimants from proceeding; it was the court which declared that the company need not pay at once. True, the company had procured the order, and was its author in a sense which would have associated it in responsibility, had the court been a juristic person. It was not, and the company was insulated from legal liability. Any one who acts honestly and does not subject himself to a charge of malicious prosecution is as free from liability in invoking the action of a court as the court itself, and what he does under its order is not a wrong. The party aggrieved has no remedy except in so far as the court may have protected him by bond or otherwise, as a condition upon the order, and as security against its own errors. (citations omitted)

52 F.2d 134–35.

The rule has become equally well established in other circuits, *e.g. Lucsik v. Board of Education,* 621 F.2d 841, 842 (6th Cir. 1980), *quoting United States Steel Corp. v. United Mine Workers of America,* 456 F.2d 483, 492 (3d Cir.1972), *cert. denied,* 408 U.S. 923, 92 S.Ct. 2492, 33 L.Ed.2d 334 (1972); *United Motors Service v. Tropic-Aire,* 57 F.2d 479, 483 (8th Cir.1932) and finds ample support in Supreme Court precedent. *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510–11, 92 S.Ct. 609, 611–612, 30 L.Ed.2d 642 (1976); *United Mine Workers of America v. Pennington,* 381 U.S. 657, 669–70, 85 S.Ct. 1585, 1592–1593, 14 L.Ed.2d 626 (1965); *Meyers v.*

*Block,* 120 U.S. 206, 211, 7 S.Ct. 525, 527, 30 L.Ed. 642 (1886).

The cases of *Commerce Tankers v. National Maritime Union,* 553 F.2d 793 (2d Cir.1977) and *DiGaetano v. Texas Company,* 300 F.2d 895 (3d Cir.1962) cited by plaintiff are not to the contrary. *Commerce Tankers* involved the defendant's attempt to enforce a restraint-on-transfer clause found to constitute a per se violation of the Sherman Act.[7] The defendant initially succeeded in obtaining injunctive relief compelling the plaintiff to abide by the clause but the injunction was subsequently vacated. In sustaining plaintiff's attempt to recover on account of defendant's obtaining a wrongful injunction the Second Circuit acknowledged the continuing vitality of the injunction bond rule as set forth in *Kellogg* but found it inapplicable "... to the antitrust claim pressed on the *unique facts* of this case" 553 F.2d 800. (emphasis added) After acknowledging the purpose served by rule the court noted that it did not insulate one from the consequences of acts taken prior to and independent of the obtaining of the injunction. Specifically, it stated that:

Had Commerce and Vantage brought their actions before the NMU's suit to enforce the restraint-on-transfer clause, their recovery would not have been barred by the intervening wrongful injunction, nor would their damages have been limited to the amount of the bond. We do not believe that their rights are altered because Commerce asserted its antitrust claims as counterclaims in the suit against it.

*Id.*

Similarly, the Third Circuit in *DiGaetano* acknowledged the inapplicability of the injunction bond rule to acts taken prior to the obtaining of an injunction. 300 F.2d at 897.

In its attempt to get out from under the weight of the *Commerce Tankers* and *DiGaetano* cases plaintiff here characterizes

---

**7.** The clause in question was contained in a collective bargaining agreement to which Commerce was a party. It provided that if Commerce sold a vessel to a party not already under contract with the NMU the ship would have to be sold with a crew provided by the NMU and Commerce would have to exact a promise from the buyer to abide by the NMU contract. *Commerce Tankers v. National Maritime Union,* 553 F.2d 796.

the gravaman of its cause of action as the defendants' *use* of the 16.6% price advantage and *not the obtaining of the injunction itself.* In doing so, it seeks to make out that independent violation that the *Commerce Tankers* and *DiGaetano* cases contemplated. The attempt, however, is unavailing. It draws an artificial distinction which fails to comport with the realities of these cases. No one seriously disputes that but for entry of the injunctions in the franchise litigations the instant suits would not and could not have been commenced. Since the aim and purpose of these injunctions was to restore a competitive advantage the distributors' were authorized to use however and whenever they wished under the July 1978 exclusive distributor agreement, they could not properly be prohibited from using that advantage today. Thus, it is clear that what PBSI complains of in these suits is nothing more than restoration of the *status quo* under the injunctions in the franchise litigations.[8] To the extent that restoration of the *status quo* between these

parties has created difficulties between PBSI and its other distributors the court notes again that this is the product of PBSI's activities and not the court's orders.

If and when it is determined that PBSI was wrongfully enjoined in the franchise litigations[9] its only recourse would be against the security posted by Carlos and Executive in those cases. *See also Sanko Steamship Co. v. Newfoundland Ref. Co., Ltd.,* 437 F.Supp. 947 (S.D.N.Y.1977); *Jamaica Lodge 2188 et al. v. Railway Express Agency, Inc.,* 200 F.Supp. 253 (E.D.N.Y. 1961).

Thus, the court is convinced that even taking all the facts of plaintiff's complaint as true "... it appears that plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). The motions to dismiss the complaints are therefore GRANTED.[10]

---

**8.** PBSI does not assert that the franchise actions were brought or are being maintained in bad faith.

**9.** PBSI's claims for damages on account of the injunctions are premature. Such claims would not accrue until the injunctions were vacated. Thus, these cases are another step removed from the *Commerce Tankers* and *Kellogg* situations where the injunctions were ultimately vacated.

**10.** A section 2(f) buyer violation is entirely derivative of a seller's 2(a) violation. Thus, in addition to alleging the elements of section 2(f), plaintiff must allege the elements of a 2(a) violation on the part of a seller. *Great A & P Tea Co. v. FTC,* 440 U.S. 69, 99 S.Ct. 925, 59 L.Ed.2d 153 (1979); *Automatic Canteen Co. v. FTC,* 346 U.S. 61, 73 S.Ct. 1017, 97 L.Ed. 1454 (1953). Section 2(a), 15 U.S.C. § 13(a), provides in pertinent part that:

(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the Unit-

ed States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them:

A seller violates Robinson-Patman where he makes at least two sales of goods of like grade and quality at discriminatory prices to different purchasers within the same approximate time period and the effect of doing so is to injure competition. Section 2(a) as well as 2(b), 15 U.S.C. § 13(b), contain the statutory defenses available to a seller charged with a violation. They include the defenses that the prices charged were cost justified, were established to meet the competition, or were established to keep pace with changing market conditions. All defenses available against a seller in a 2(a) case are available to a buyer in a case brought under 2(f). *See Great A & P Tea Co. v. FTC,* supra 440 U.S. at 82, 99 S.Ct. at 934.

These cases present the rather unique situation of a seller suing two of its own buyers under § 2(f). Arguably, plaintiff's complaints are fatally defective to the extent they rather gingerly avoid asserting a 2(a) violation on PBSI's part. Even assuming, *arguendo,* that this did not represent a defect in plaintiff's complaints it might well be that the injunctions entered in the franchise actions represent complete defenses to these actions.

These are issues, however, that the court need not address in view of its holding today.

## SANCTIONS AND ATTORNEY'S FEES

■ Defendants have also moved for sanctions and an award of attorneys fees against plaintiff and its counsel on the ground that these actions were commenced and are being maintained without adequate factual basis and in bad faith. The authority to award attorneys fees in these circumstances is well established. *See Roadway Express, Inc. v. Piper,* 447 U.S. 752, 766, 100 S.Ct. 2455, 2464, 65 L.Ed.2d 488 (1980); *Alyeska Pipeline Co. v. Wilderness Society,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975). It is an authority which has just recently been reaffirmed in this circuit. *Nemeroff v. Abelson,* 704 F.2d 652 (2d Cir.1983). Nevertheless a court is well advised to use the power sparingly lest it deter the vigorous championing of meritorious causes of action. *Nemeroff v. Abelson,* 704 F.2d at 654. It is, after all, an exception to the traditional American Rule that each side bears its own attorney's fees.

On March 29, 1983, PBSI filed these actions. At the time it attempted to have the cases assigned to another judge of the court because in its view they were not "related to" the prior franchise actions within the meaning of Local Calendar Rule 3.[11] The attempt was made despite PBSI's recital, in the complaints, that the institution of the franchise actions was the key act taken by plaintiffs in furtherance of their plan to induce discriminatory prices.[12]

The filing of these actions came on the heels of plaintiff's repeated failure to have the court reconsider its decision to implement the preliminary injunctions in the franchise actions and after affirmance of the injunction in the *Executive* action. As the court had held, however, these cases represent nothing more than elaborate attempts to reargue the injunction decisions via the circuitous route of recasting those cases as ones sounding in antitrust.

Under these circumstances the court comes to the inescapable conclusion that the filing of these two actions was undertaken as one more step in a pattern of obdurate and obstinate behavior designed to have the

---

**11.** Local Calendar Rule 3 provides:
    **(c) Assignment of Related Cases.** All related cases shall be assigned by the clerk to the judge whom was assigned the first case filed (i.e., the case bearing the lowest docket number) of any given series of cases. The clerk shall advise the judge when he assigns a case as a "related case."
    Rule 3(a) goes on to provide that:
    **(a) Defined.** One case is "related" to another for purposes of this rule when, because of similarity of facts and legal issues or because the cases arise from the same transactions or events, a substantial saving of the time of the whole court is likely to result if the cases are assigned to the same judge.

**12.** In the *Executive* action paragraph 22 of the complaint states that:
    22. In furtherance of such conduct, Executive has commenced an action in this Court, *Executive Business Systems, Inc. v. Philips Business Systems, Inc.,* 81 Civ. 2075 (HB), predicated upon the New Jersey Franchise Act N.J.S.A. 56–10:1 *et seq.* In a purported attempt to maintain the *status quo ante,* a preliminary injunction was entered on July 23, 1981. Thereafter, defendants, through Executive, sought and obtained an order, dated January 14, 1982, by which PBSI was compelled to sell to defendants at discriminatory prices and on discriminatory terms.

    In the *Carlos* action paragraph 21 of the complaint states that:
    21. In furtherance of such conduct, Carlos has commenced an action in this Court, *Don A. Carlos v. Philips Business Systems, Inc.,* 81 Civ. 2569 (HB), predicated upon the New Jersey Franchise Act N.J.S.A. (56–10:1 *et seq.*) and the Connecticut Franchise Act (§ 41–133e *et seq.*). In a purported attempt to maintain the *status quo ante,* Carlos sought and obtained a preliminary injunction, which was entered on February 28, 1983, purporting to compel PBSI to continue to sell to Carlos at the discriminatory prices he has knowingly induced and on such discriminatory terms as he has knowingly induced.
    In its letters to Chief Judge Weinstein as well as to this court outlining its reasons for assignment to another judge PBSI stated that the franchise and antitrust cases are not "strictly" related. In addition, it stated that it did not feel the court could fairly and impartially analyze the Robinson-Patman claim in view of its rejection of that claim in the earlier franchise actions. Finally, it stated that the court could not fairly and impartially analyze the Robinson-Patman claim in view of its orders of injunction in the earlier cases. Finding no merit in any of these contentions the court declined to reassign the cases.

court vacate the preliminary injunctions.[13] PBSI's sole recourse to attack these injunctions was within the confines of the original litigations. Failing this, PBSI was not at liberty to expand and escalate the litigation to a new front in pursuit of the identical goal.[14] Rather it was obligated to proceed with the case until such time as its appellate rights accrued at which time a renewed effort to modify the results could be undertaken. What PBSI has chosen to do here instead exceeds what this court considers to be the outer limit of zealous advocacy.

Proceedings in these new actions up to this point have not come without substantial legal expense to both sides. Unlike PBSI, however, the defendant distributors here are essentially small business people who do not enjoy the financial clout of their much larger adversary. They are therefore less able to afford the litigation on the grand scale PBSI contemplates.[15] They were already litigating with PBSI on one front when these suits were commenced. Significantly, the new suits were commenced to accomplish precisely what PBSI was uniformly unsuccessful in accomplishing in the earlier cases. In the court's opinion commencement of action represents an abuse of the litigation process which borders on harassment in view of what has transpired thus far in the original cases. PBSI, no matter how vehement its disagreement with the entry of the injunction in those cases, simply had no right to have the court readdress those decisions under the guise of a supposedly new and unrelated action. Under these compelling circumstances the court feels that an award of attorney's fees is warranted to "spare [Executive and Carlos] from the expense of defending against baseless allegations." *Nemeroff v. Abelson*, 704 F.2d at 652.

Accordingly the defendants are hereby directed to submit contemporaneous time records reflecting billings and disbursements generated in connection with these two actions. After receiving these an award of reasonable attorney's fees will be made.

IT IS SO ORDERED.

---

**13.** Contrary to assertions in its papers and at oral argument that it is not the existence of the injunctions in and of themselves that underlie these cases, PBSI, on page 39 of its memorandum in opposition to the motion, flatly states that the injunctions must be vacated under supremacy principles since compliance with them results in violations of the Robinson-Patman Act.

**14.** What the court finds especially disturbing is the fact that the court, in the *Executive* and *Carlos* franchise actions, rejected the notion that these cases are Robinson-Patman cases on three separate occasions. On March 30, 1982 it did so implicitly in the course of denying PBSI's motion to amend its answer to include a counterclaim for money lost on account of giving Executive distributor prices. On February 4, 1983, it did so explicitly in the course of denying Executive's motion for a protective order. On February 16, 1983 it did so in the *Carlos* injunction decision.

**15.** Interim awards of attorneys fees have been made to Executive and Carlos in the franchise cases pursuant to N.J.Stat.Ann. § 56:10–10 as well as Conn.Gen.Stat. § 42–133g.