**Don A. CARLOS, d/b/a D & S Business Systems, D & S Word Processing Systems and Diskriter, Plaintiff,**

v.

**PHILIPS BUSINESS SYSTEMS, INC., Defendant.**

No. 81–CV–2569.

United States District Court, E.D. New York.

Feb. 16, 1983.

Emmet, Marvin & Martin by Dennis C. Fleischmann, New York City, for plaintiff.

Gifford, Woody, Palmer & Serles by John T. Morin, New York City, for defendant.

**1.** The numbers in parentheses denote reference to the transcripts of the hearing held in

BRAMWELL, District Judge.

On August 14, 1981, July 14, 1982, and September 14, 1982, this court convened a hearing upon plaintiff's application for a preliminary injunction. The plaintiff, an exclusive distributor of Norelco office machine products, has sued to enjoin what it perceives to be an illegal termination of its business by defendant. Today, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure the court disposes of that application.

The court shall also dispose of plaintiff's application for a contempt citation of defendant for violating paragraphs (i) & (iv) of the temporary restraining order entered in this action on August 6, 1981 as well as defendant's application to vacate that order.

## FINDINGS OF FACT

1. The plaintiff, Don A. Carlos, (hereinafter referred to as Carlos) is a sole proprietor doing business as D & S Word Processing Systems, D & S Business Systems, and Diskriter with places of business in Trenton, New Jersey; Hartford, Connecticut; and Ohio, respectively. (Complaint ¶ 1, A26, J5–6)[1]

2. The defendant, Philips Business Systems, Inc., (hereinafter referred to as PBSI) is a Delaware corporation with its principal place of business at 810 Woodbury Road, Woodbury, New York. PBSI markets Norelco dictating equipment. (Complaint ¶ 3)

3. Carlos first began selling Norelco dictation equipment in 1970 as a salesman for D & R Word Processing Systems, the then distributor for PBSI in Hartford, Connecticut. (A27, J5)

4. In June 1973, Carlos was offered a Norelco dealership by PBSI for the Trenton, New Jersey area and opened a place of business there. (A27, J5) At that time PBSI had a two tier marketing system consisting of dealers and exclusive distributors. Under that system exclusive distributors had certain competitive advantages over

(A)ugust of 1981 and (J)uly and (S)eptember of 1982.

PBSI's dealers with respect to price, terms, and advertising. (A28, J18)

5. By letter dated December 20, 1974, PBSI offered to convert Carlos from a dealer to a distributor and appoint him an authorized exclusive distributor of Norelco dictating equipment effective January 1, 1975 for eight counties in southern New Jersey. (Pl.Ex. 1, A28, 30, J5)[2]

6. In that same letter PBSI advised Carlos that it was making a marketing change as a result of which some former dealers, such as Carlos, were being offered exclusive distributorships while other former direct dealers would be referred to distributors for future business. (Pl.Ex. 1)

7. On or about January 1, 1975, Carlos entered into the first of two exclusive distributorship contracts with PBSI. (Pl.Ex. 1 and 2)

8. Shortly thereafter, in the early part of 1975, Carlos' former employer, D & R Word Processing Systems in Hartford, Connecticut, offered to sell Carlos the exclusive distributorship for the Hartford, Connecticut area. (A29, J5-6) After discussions with Arthur L. Hanrahan, President of PBSI, Carlos purchased the exclusive distributorship for the counties of Tolland and Hartford, Connecticut from his former employer in April 1975 with the approval of PBSI. (A29, J6) As a condition to that approval, PBSI required Carlos to maintain his office in New Jersey, which he did. (J8)

9. On July 1, 1978, Carlos and PBSI entered into a successor agreement which gave Carlos the exclusive right to use the Norelco trademark and to sell and service Norelco dictating products in eight counties in southern New Jersey and two counties in Connecticut. (Pl.Ex. 2, A35)

10. During the period covered by his distributor contracts Carlos successfully developed his business to the point that, in October 1980, Carlos began negotiations with Jerry I. Eichelsbacher of Diskriter, Incorporated to acquire the exclusive distributorship for Norelco dictation products in sixteen counties in Ohio. After obtaining approval from PBSI, Carlos acquired the Ohio portion of the Diskriter exclusive distributorship for Norelco dictation products in November 1980. (Pl.Ex. 17-18, A36, J6, J39)

11. Carlos conducts his Norelco dictation franchise in the states of New Jersey, Connecticut and Ohio pursuant to a written arrangement in which PBSI granted him a license to use the trademark "Norelco", in which there is a community of interest in the marketing of Norelco dictation products. (Pl.Ex. 2, A46-49, J23, J103)

12. Carlos maintains a place of business at 2561 Yardville, Hamilton Square Road, Trenton, New Jersey where he displays and offers to sell and sells Norelco dictation products. Carlos' place of business in New Jersey was approved by PBSI and reflects the normal business characteristics of a distributor of dictation equipment. (J7)

13. The gross sales of Norelco dictation equipment between PBSI and Carlos covered by his franchise exceeded $35,000 for the twelve months next preceding the commencement of this action. (Pl.Ex. 11-14, J9) His total purchases from PBSI during that period exceeded $450,000. (Pl.Ex. 11, J9)

14. More than 20% of Carlos' sales are intended to be and are, in fact, derived through his franchise. (J9) Overall, approximately 90% of his sales are of Norelco dictation products. (J10) Carlos' sales in New Jersey alone for the twelve month period immediately preceding the commencement of this lawsuit were approximately $150,000. (Pl.Ex. 13, J13-15)

15. Under PBSI's marketing plan and system, Carlos, as a distributor, was required to send representatives of his business to sales meetings (J17), including training at Norelco University (J22, S13), to maintain proper coverage of his territories with salespeople (Pl.Ex. 15, J19), to maintain proper office facilities to demonstrate Norelco dictation products (J20) and to service, with factory trained technicians (J21), the Norelco dictation equipment that he

2. "Pl.Ex." denotes reference to the numbered exhibits introduced by plaintiff at the hearing.

sold. PBSI set quota requirements and Carlos was required to provide periodic sales reports to PBSI. (Pl.Ex. 2, J21) Carlos was also required to maintain an adequate inventory of parts. (J21) The format for yellow page advertising was dictated by PBSI (Pl.Ex. 7, A49, J23) and on at least one occasion Carlos was compelled to advertise a Norelco dictation product at a substantially reduced price in order to prevent PBSI from selling directly in his exclusive New Jersey territory. (Pl.Ex. 16, A52–53, J24) PBSI also directed Carlos to increase his sales staff in the Hartford office. (Pl.Ex. 15, J19)

16. Carlos was also required from time to time to provide financial information and statements to PBSI and to submit 4–I cards. (J26, 94) Under the 4–I reporting system, Carlos was required to fill out a card for each dictation machine he sold and provide PBSI with the name of the customer to whom it was sold. (J28)

17. In 1979, PBSI began to establish direct dealers known as Independent Retail Outlets ("IRO's"). (S148) They were designed to replace failed distributors or to cover areas not already covered by an exclusive distributor. IRO's received less favorable prices, terms and advertising than did exclusive distributors, such as Carlos. (Pl.Ex. 23–24, J53–58)

18. On or about May 1, 1981, Carlos received a memo from PBSI advising him that a new agreement designed to "address the marketplace as it exists today" would be sent to him in the near future. All fifty-five of PBSI's exclusive distributors received this letter. (Pl.Ex. 8, A51)

19. While Carlos thought that this new agreement referred to by PBSI would be a renewal of his existing distributorship agreement, it was not. (Pl.Ex. 2, Pl.Ex. 9, A51–52)

20. During the period covered by the 1978 distributor agreement, Carlos substantially complied with requirements of that agreement. PBSI never threatened to terminate that agreement. (Pl.Ex. 2, A19, A103)

21. Sometime before June 30, 1981, PBSI decided to make a major marketing change in the selling of Norelco dictation equipment. (A105, Dentone aff. ¶4) PBSI concluded that it would be more beneficial for it to sell to many dealers rather than to its existing 55 exclusive distributors. Accordingly, on or about July 1, 1981, PBSI offered a new dealer agreement not only to its former distributors but to many other businesses as well. (Pl.Ex. 9, A97)

22. Under the dealer agreement offered by PBSI to Carlos on or about July 1, 1981, Carlos would lose his exclusive territorial rights with respect to the sale and servicing of Norelco dictation equipment. (Pl.Ex. 2 and 9, A57, J30, S65–66) PBSI would be in a position to compete directly with Carlos with respect to present and potential customers. (A58, J32–33, 65–69) Carlos would also be deprived of significant competitive advantages with respect to price, terms and advertising that he previously had over PBSI's direct dealers and many other businesses which are now being offered dealer contracts. (Pl.Ex. 2 and 9, J30, 52–57, S65–66)

23. Under more recent "dealer agreements" offered by PBSI and rejected by plaintiff, Carlos would lose exclusive rights to national and government accounts. PBSI could, if it wishes, open a branch office, appoint a distributor or open service centers in Carlos' territories which it could not have done under the 1978 distributor agreement. (Pl.Ex. 22, Def.Ex. C, J47–50, A92, 99, 101) [3]

24. Based on the inherent benefits of his exclusive distributorship, Carlos was able to significantly expand his business. (A31, J39) In the process of the development of his business, Carlos incurred substantial personal obligations in the belief that as long as he substantially complied with the terms of his distributor agreement he would

---

3. "Def.Ex." denotes reference to the lettered exhibits introduced by defendant at the hearing.

be able to continue as an exclusive distributor with all the benefits of being an exclusive distributor. (Pl.Ex. 17–21, J39)

25. On August 6, 1981, Carlos obtained a temporary restraining order as part of his order to show cause for a preliminary injunction. That temporary restraining order is nearly identical to the temporary restraining order and preliminary injunction entered in an action commenced by another distributor entitled *Executive Business Systems, Inc. v. Philips Business Systems, Inc.,* 81 Civ. 2075 which is also before this court. The preliminary injunction in the *Executive* action was explicated in considerable detail in the court's contempt decision of January 14, 1982 which, among other things, adjudged PBSI guilty of contempt for attempting to charge Executive dealer prices on dealer terms.

26. If Carlos is forced to become a dealer, pay dealer prices on dealer terms, and face increased competition from many newly created dealers who could not compete with him before July 1, 1981, and possibly be thrust into direct competition with PBSI, he will suffer a substantial decline in sales and service revenue. (J30–52, S48–51, 65–66) As a result, he will be unable to meet many of his business and personal obligations that he incurred in the belief that he would be able to continue as an exclusive distributor as long as he substantially complied with his distributor agreement. (J41–46, S65–66)

27. Since July 1, 1981, PBSI has billed Carlos at dealer prices on thirty day dealer terms rather than the traditionally more favorable distributor price and sixty day distributor term. (Pl.Ex. 25–26, Ex. F to Notice of Cross-Motion, S82) PBSI contends that with the elimination of distributors there is no longer a more favorable distributor price and distributor term. (Ex. F to Cross-Motion, S109–11) In fact, PBSI contends that there never was such a difference between distributors and dealers. (S119)

28. Carlos initially attempted to comply with the new dealer price list and dealer term rather than risk cancellation. However, when this court adjudged PBSI guilty of contempt for failing to provide Executive Business Systems with the traditional 16.6% distributor price advantage and 60 day distributor payment term, Carlos withheld 16.6% from his payments and began making payments on the distributor 60 day term. (J57–60, S73) In January, 1982, Carlos also demanded of PBSI, through his attorneys that he be billed in the manner in which this Court directed that PBSI bill Executive. (Pl.Ex. 25 and 26, J57–58)

29. PBSI did not comply with that demand but instead sought to challenge this Court's ruling with respect to price and terms in the *Executive* case. Despite this court's refusal to change its contempt decision with respect to prices and terms as evidenced by its decision of March 30, 1982 and its Order dated April 8, 1982, PBSI, through Mr. Dentone, its Executive Vice President, wrote to Carlos on April 15, 1982 and advised him that although PBSI wished to continue to do business with him it "will not be able to do so as long as they unilaterally, and without authorization, violate Judge Costantino's Order by withholding partial payment with respect to Norelco products sold to them, and by making payment to PBSI on terms which extend beyond thirty (30) days." (Ex. D to Cross-Motion, S109–110)

30. PBSI contends that the only reason Executive receives a more favorable price and distributor term is that it sold to dealers while Carlos sold only to end users. (Ex. D to Cross-Motion, A15–16, S125) Mr. Dentone stated this even though he knew full well, as did this court, that Executive sold to end users as well as dealers and that furthermore before July 1, 1981 the distributor price and distributor term did not depend on whether a distributor sold to a dealer or to an end user. (Ex. D to Cross-Motion, S123–25, 127, J61)

31. Despite the decisions of this court in the *Executive* case, PBSI persists in maintaining that there is no distributor price or distributor term and demands that Carlos pay dealer prices on dealer terms. (Ex. D and F to Cross-Motion, S109–111, 117–120, 123–125)

32. The hearing on the preliminary injunction began on August 14, 1981 before Judge Nickerson and was continued before this court on July 14, 1982 and September 14, 1982. At the close of the hearing, the court continued the temporary restraining order until issuance of this Decision. (S157)

## CONCLUSIONS OF LAW

With the foregoing background in mind, the court now turns to an examination of plaintiff's request for preliminary injunctive relief.

In this circuit, a moving party may obtain a preliminary injunction if it establishes (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Sperry International Trade, v. Israel,* 670 F.2d 8 (2d Cir.1982); *Crouse-Hinds Co. v. Internorth, Inc.,* 634 F.2d 690 (2d Cir.1980); *Seaboard World Airlines, Inc. v. Tiger International, Inc.,* 600 F.2d 355 (2d Cir.1979); *Sonesta International Hotel Corp. v. Wellington Associates,* 483 F.2d 247 (2d Cir. 1973); Mulligan, *Foreword-Preliminary Injunction in the Second Circuit,* 43 Brooklyn L.Rev. 831 (1977).

## IRREPARABLE INJURY

■ Irreparable injury is "injury for which a monetary award cannot be adequate compensation." *Jackson Dairy, Inc. v. H.P. Hood & Sons,* 596 F.2d 70, 72 (2d Cir.1979). An example of such an injury is an act that threatens an ongoing business

with destruction. *John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.,* 588 F.2d 24, 28–29 (2d Cir.), *cert. denied,* 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979); *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205 (2d Cir.1970). Here, plaintiff argues that PBSI's attempted transformation of his exclusive distributorship into a dealership constitutes such an act. The court agrees.

A transformation of Carlos' business into just one of many dealers would thrust it into a ruinous competition with PBSI which clearly could not have taken place prior to the attempted implementation of the July 1, 1981 dealer agreement. It would deprive plaintiff of the competitive edge that it enjoyed by virtue of the preferential price and terms traditionally enjoyed by exclusive distributors for Norelco. In view of the fact that almost 90% of Carlos' business is comprised of sales of Norelco products, such a transformation would represent nothing less than the gravest threat to the viability of the business itself. Therefore, the court concludes that the plaintiff has adequately substantiated his claim that defendant's conduct threatens to cause him irreparable harm.

## LIKELIHOOD OF SUCCESS ON THE MERITS

■ In order to determine whether plaintiff enjoys a likelihood of succeeding on the merits, reference is made to the controlling statutes in the case [4]—the New Jersey Franchise Practices Act, N.J.Stat. Ann. § 56:10–1 *et seq.* (West Supp.1982–83); and the nearly identical Connecticut Franchise Act, Conn.Gen.Stat. § 42–133e *et seq.* (West Supp.1982).

---

4. While it is true that the parties designated New York law as controlling it is also true that the reference to New York law made in paragraph 21 of the July, 1978 agreement was in no way limited or circumscribed to include only substantive law. Specifically, it is the finding of the court that the whole law of New York, including its conflicts of law principles, must be referenced on this issue.

Currently, under such conflict principles, New York courts look not to the mere number of contacts with New York but the significance of such contacts. *Intercontinental Planning Ltd. v. Daystrom,* 24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969). Here, the parties who stand to lose the most by virtue of the attempted termination do business in New Jersey, Connecticut and Ohio. Thus, it is these states, as opposed to New York, that have the only true interest in the outcome of the litigation since they would be the states which would bear any economic burdens associated with business failures occurring within their borders. *See also Business Incentives Co., Inc. v. Sony,* 397 F.Supp. 63 (S.D.N.Y.1975).

## THE NEW JERSEY ACT

The New Jersey Act "define[s] the relationship and responsibility of franchisors and franchisees in connection with franchise agreements." N.J.Stat.Ann. § 56:10–2 (West Supp.1982–83). Its drafters sought to "rule out arbitrary and capricious cancellation of franchises while preserving the right of franchisors to safeguard their interests through the application of clear and nondiscriminatory standards." *Assembly Bill* 2063 (1971).

The New Jersey Supreme Court views the Franchise Practices Act as a reflection of "legislative concern over long-standing abuses in the franchise relationship," such as instances of economic dominance by a franchisor over its franchisee. *Shell Oil Company v. Marinello*, 63 N.J. 402, 409, 307 A.2d 598, 602 (1973), *cert. denied*, 415 U.S. 920, 94 S.Ct. 1421, 39 L.Ed.2d 475 (1974). Other cases have echoed this rationale, characterizing the Franchise Practices Act as a provision "intended to rectify [this] lack of equal bargaining power" between the franchisor and the franchisee. *Westfield Centre Service, Inc. v. Cities Service Oil, Co.*, 158 N.J.Super. 455, 467, 386 A.2d 448, 459 (1978). *See also Amerada Hess Corp. v. Quinn*, 143 N.J.Super. 237, 362 A.2d 1258 (1976).

The purposes of the Act are furthered principally by N.J.Stat.Ann. § 56:10–10 (West Supp.1982–83) which grants a franchisee the right to bring an action against its franchisor to recover damages for or to obtain injunctive relief against a violation of the Act. Carlos has utilized this section as the predicate for the portion of his case, involving D & S Word Processing of Trenton, claiming that PBSI has violated the substantive provisions of the Act.

To prevail on this portion of the case, plaintiff must satisfy two elements. The first of these requires that plaintiff qualify as a "franchise" within the guidelines set forth in the Franchise Practices Act. Such an entity generally is defined as "a person to whom a franchise is offered or granted." N.J.Stat.Ann. § 56:10–3(d) (West Supp. 1982–83). The protection of the Act, however, extends only to franchises with a place of business in New Jersey, with gross sales of products covered by the franchise agreement in excess of $35,000 for the twelve month period prior to the institution of the cause of action, and with greater than 20% gross sales in the franchise product. N.J.Stat.Ann. § 56:10–4 (West Supp. 1982–83).

Here, the court is satisfied that D & S Word Processing is likely to succeed in ultimately proving that it meets both of these requirements. The two agreements entered into on January 1, 1975 on July 1, 1978 (Pl.Ex. 1 and 2) clearly evidence an agreement for Carlos to act as an exclusive distributor for PBSI in the eight designated counties in southern New Jersey. It is undisputed that Carlos maintains a place of business for D & S Word Processing at 2561 Yardville, Hamilton Square Road in Trenton, New Jersey.

The record also reveals that in the twelve months immediately preceding institution of this suit Carlos purchased between $450,-000 and $600,000 in inventory from PBSI. (J9) Moreover, almost 90% of Carlos' business was derived through his franchise agreement with PBSI with $150,000 of his sales of Norelco products being made in the New Jersey area. (J10–13)

A franchisee seeking the protection of the New Jersey Act must next demonstrate that its franchisor violated the Act. This requires the franchisee to prove that the franchisor terminated, cancelled or failed to renew the franchise without complying with the statutory requirements. *See* N.J. Stat.Ann. § 56:10–5 (West Supp.1982–83). PBSI has taken the position that the plaintiff cannot satisfy these statutory elements because PBSI has not terminated, cancelled or failed to renew the plaintiff's Norelco franchise. Rather, the defendant maintains that its intention with respect to the plaintiff is to "change" the nature of the relationship between D & S and PBSI to counter the defendant's financial misfortunes (Finding of Fact 21). The court does not agree.

■ The clear intent behind PBSI's new dealer arrangement is to streamline its marketing system by eliminating exclusive distributors such as D & S in order to more profitably exist in a changing marketplace. Any argument that the new agreement merely works a "change" is, in the court's opinion, nothing more than a poorly disguised euphemism for what is essentially a termination or failure to renew this distributorship agreement.

■ Section 56:10–5 of the New Jersey Act provides that such termination or failure to renew a protected franchise is permissible only for good cause and then only upon 60 days written notice of such cause to the franchisee. *Id.* Good cause is defined to include a failure to substantially comply with the terms of the franchise agreement. Here the court finds PBSI to have run afoul of the law in both regards.

On or about May 1, 1981 all fifty-five of PBSI's exclusive distributors, including Carlos, received a memo from Arthur L. Hanrahan of defendant advising them of a forthcoming new agreement designed "... to address the market place as it exists today." (Pl.Ex. 8). Nowhere in that memo did defendant advise Carlos of any default or failure to substantially comply with the terms of the July 1978 agreement. In fact, Carlos was never advised during the life of this agreement that he was in any way not substantially complying with it. It was not until June 29, 1981 that plaintiff actually received the proposed agreement (Pl.Ex. 9) which purported to strip him of his exclusive distributor status.

Under these circumstances it is abundantly clear that plaintiff enjoys a substantial likelihood of success on his claim of violation of the New Jersey Act.

### THE CONNECTICUT ACT

The Connecticut Franchise Act, Conn. Gen.Stat. § 42–133e *et seq.* (West Supp. 1982), with a few minor exceptions, is virtually identical to the New Jersey legislation. Specifically, it too limits the franchisor's right to cancel or fail to renew a covered franchise to those instances involving good cause. Conn.Gen.Stat. § 42–133f(a) (West Supp.1982). Good cause is defined to include the franchisee's "... refusal or failure to comply substantially" with any material obligation of the agreement. *Id.* Like the New Jersey statute it also requires at least 60 days prior written notice of such termination. *Id.* Unlike the New Jersey Act, however, there is no set dollar volume or percentage of sales in the franchise product required. Instead, a covered franchise is defined to include one who pursuant to an oral or written agreement sells goods "... under a marketing plan or system prescribed in substantial part by a franchisor." Conn.Gen.Stat. § 42–133e(b)(1) (West Supp.1982). Moreover, the operation of the franchisee's business must be substantially associated with the franchisor's trademark. Conn.Gen.Stat. § 42–133e(b)(2) (West Supp.1982).

■ Here the court is convinced that D & S Business Systems has made an adequate showing that it sells Norelco products under a marketing plan prescribed for the most part by Norelco (J15–18, Pl.Ex. 2). Indeed, the evidence of defendant's control over the manner plaintiff does business is overwhelming. As part of PBSI's marketing plan and system, Carlos has a license to use the trademark "Norelco" and was encouraged to associate his business with that name. (Pl.Ex. 2) Carlos has made extensive use of the Norelco trademark. (Pl.Ex. 5, 6 and 7) His business telephone in New Jersey and Connecticut is answered with the name "Norelco". (A47) His business stationery prominently features the Norelco name as does the entrance to his place of business in Connecticut.

As the exclusive authorized distributor for soliciting the sale of, selling, delivering, installing, inspecting, and servicing Norelco dictation equipment in his exclusive territories, Carlos is required to undertake performance of all warranty services in accordance with PBSI's standard warranty policy. (Pl.Ex. 2 Par. 6 and Schedule D) Carlos was also required to send representative of his business to sales meetings (J22), have

his servicemen factory trained by PBSI (J22), maintain certain levels of inventory (J21), hire an extra salesman (J19), and provide sales reports periodically to PBSI with information about his customers. (J21)

PBSI also dictates the conditions under which Carlos may return equipment and parts, dictates the format for special promotional advertisements and dictates the procedure for conducting government business. (J22–23) Moreover, under his distributor agreement, Carlos cannot sell his franchise without the approval of PBSI. Finally, Carlos testified to instances where he could not negotiate a significant change in the 1978 distributor agreement with respect to a buy out provision (A33–34, J28–29) and was forced to participate in special promotions at unfavorable prices. (Pl.Ex. 16, A52–55, J23–26)

With respect the issues of a good cause cancellation preceded by adequate written notice for D & S Business Systems of Hartford the court finds that PBSI, for the same reasons it was in violation in New Jersey, is in violation of the substantially identical provision of the Connecticut Act.

In sum then, it is clear that plaintiff enjoys a substantial likelihood of prevailing under the Connecticut Act as well.

### OHIO

■ Ohio does not presently have a franchise protection statute on the books. Plaintiff, nevertheless, argues that because the Diskriter portion of Carlos' business comprises 50% of his total sales a business interruption there would seriously jeopardize his operations in Connecticut and New Jersey thereby invoking the protection of these states' Acts. The court has not been cited to, nor can it find any authority for the proposition that the New Jersey and Connecticut Legislatures purported to give this important legislation extraterritorial effect. Therefore, it declines to so apply them. Nevertheless, it does appreciate the significant role that the Diskriter portion of Carlos' business plays.

■ Preliminary injunctions are designed to maintain the status quo pending a final determination on the merits. *See* 7 Moore's Federal Practice § 65.04[1] (2d ed. 1973). *See also Diversified Mortgage Investors v. United States Life Insurance Co.,* 544 F.2d 571, 576 (2d Cir.1976). Here, the court credits plaintiff's contention that without the entry of injunctive relief for the Diskriter portion of plaintiff's business a fairly significant probability of the Connecticut and New Jersey portions of the business being adversely affected would exist. Accordingly, the court is of the opinion that the grant of preliminary relief with respect to Diskriter should be, and is hereby granted.

### CONTEMPT

Plaintiff also cross-moves to hold defendant in contempt for violating the temporary restraining order entered in this action by Judge Costantino on August 6, 1981 to the extent it threatened plaintiff with termination and continued to treat Carlos as a dealer after this date. *See* Finding of Fact 29. Specifically, plaintiff asserts that PBSI violated paragraphs (i) and (iv) of that order. These paragraphs provide in pertinent part that:

The defendant, its officers ... be and hereby are enjoined from:

(i) cancelling, terminating, or otherwise amending the Distributor Agreement dated July 1, 1978 between the plaintiff and the defendant...

(iv) directing the defendant to continue or renew the Agreement on the same terms and conditions, and to fully comply therewith, pending final determination of this action....

■ Despite the fact that the court takes a rather dim view of defendant's conduct in this regard it will not, at this time, hold defendant in contempt. It does, however, direct that defendant immediately issue amended invoices reflecting distributor prices and terms for the period in question and in all other respects treat Carlos as he was treated prior to July 1, 1981. It would also take this opportunity to caution defendant that persisting in such a continuing

course of recalcitrant conduct might well result in a citation with appropriate civil sanctions at some future date.[5]

## CONCLUSION

In sum then the application for preliminary injunctive relief is GRANTED, the motion to vacate the temporary restraining order is DENIED, and the cross-motion to hold defendant PBSI in contempt is also DENIED.

The parties are to settle orders consistent with this opinion forthwith.

SO ORDERED.

**5.** The court finds defendant's remaining contentions with respect to constitutional and antitrust violations patently meritless.