975 A.2d 510 (2009)
408 N.J. Super. 461
MAINTAINCO, INC., Plaintiff-Respondent,
v.
MITSUBISHI CATERPILLAR FORKLIFT AMERICA, INC., Defendant-Appellant.
No. A-1485-07T2
Superior Court of New Jersey, Appellate Division.
Argued March 23, 2009.
Decided July 30, 2009.
*511 Kevin McNulty and H. John Schank, II, Newark, argued the cause for appellant (Gibbons, P.C., attorneys; Mr. McNulty, Mr. Schank and Natalie H. Mantell, of counsel and on the brief; Richard B. Specter (Corbett, Steelman & Specter) of the California bar, admitted pro hac vice, on the brief).
Theodore Margolis argued the cause for respondent (Norris, McLaughlin & Marcus, P.A., attorneys; Mr. Margolis, Jeremy I. Silberman and Haekyoung Suh, of counsel and on the brief).
*512 Before Judges LISA, REISNER and SAPP-PETERSON.
The opinion of the court was delivered by
LISA, P.J.A.D.
The dispute in this appeal involves application of provisions of the Franchise Practices Act (Act), N.J.S.A. 56:10-1 to -15. After a bench trial, the court found that defendant, the franchisor, breached the franchise agreement and violated the Act. The court awarded plaintiff compensatory damages of $734,000. Plaintiff then sought a counsel fee award as authorized by the Act. See N.J.S.A. 56:10-10. The court awarded attorney's fees of $3,533,642.50, and costs of $724,817.21, which included expert fees of $477,611.46.
We must determine whether constructive termination violates the Act. A threshold issue is whether the record supports the trial court's finding that defendant's conduct breached the franchise agreement and constituted an attempt to terminate the contract, which was prevented only by plaintiff's initiation of this action. We must also determine whether expert fees are allowable under the Act. We hold that constructive termination constitutes a violation of the Act, but that expert fees are not allowable.[1]

I
In 1958, James Picarillo, Sr. founded plaintiff Maintainco, Inc. He operated out of a 500 square foot facility in Union City, repairing and rebuilding forklifts. By the mid-1970s, plaintiff was selling several different brands of new forklifts, and it continued providing repairs and service. The business facilities and number of employees grew. Eventually, James Picarillo, Sr.'s sons, James Picarillo, Jr. and Raymond Picarillo, joined their father in the business.
In 1982, after learning that Mitsubishi[2] no longer had a New Jersey distributor, plaintiff approached Mitsubishi and expressed an interest in marketing Mitsubishi forklifts along with its other brands. Plaintiff and Mitsubishi entered into a dealership agreement in July 1982. Plaintiff's territory, or "area of prime responsibility" (APR), comprised the twelve northernmost counties in New Jersey. The agreement "appointed" plaintiff a dealer, and required that it "shall exert its very best efforts to promote the sales and servicing of Products in furtherance of its appointment." Paragraph 3(d) provided that plaintiff's APR could be changed from time to time by Mitsubishi, and that Mitsubishi could "appoint more than one dealer to share all, or any portion, of [plaintiff's APR]." Mitsubishi reserved the right to designate certain customers as "national accounts" and to sell its products to them directly, with deliveries to the customers' facilities made by the dealer in whose territory a facility was located. Mitsubishi also reserved the right to sell directly to *513 federal or foreign government agencies, exporters, and other manufacturers in plaintiff's APR.
Notwithstanding Paragraph 3(d), various Mitsubishi officers testified that the industry custom was for an APR to be a dealer's exclusive territory, that dealers were aware of the custom, and, whenever asked about exclusivity, they were assured they were exclusive. Mitsubishi did not have nationwide dealer coverage, and its market share at that time was below 2%. Therefore, Mitsubishi looked for dealers who were willing to take on a new brand, and those dealers were not expected to make Mitsubishi their sole or "primary line." No such demand was ever made of plaintiff.
"Best efforts" was not defined in the contract. According to Mitsubishi's dealer development manager, it was a common term in the industry. It did not require dealers to maintain a separate facility or separate sales force for the Mitsubishi line. It basically required dealers to perform in accordance with an approved marketing plan.
In 1983, both plaintiff and the Mitsubishi dealer for the state of Connecticut, Tri-Lift, which had a branch location in Bergen County, complained to Mitsubishi that their territories overlapped. In February 1984, plaintiff continued to complain, threatened to take on another supplier, and informed Mitsubishi it had already spoken to other manufacturers, including Caterpillar and Toyota. The problem resolved itself later that year when Tri-Lift ceased carrying a Mitsubishi line.
However, when the time came for a new contract, plaintiff insisted on exclusivity and it was assured by Mitsubishi's dealer development manager that the new contract would confer it. In the new 1985 agreement, Paragraph 3(d) was deleted. The "best efforts" clause was modified to require plaintiff to "use its best efforts to develop the market for the Products in the APR" and to "concentrate its efforts within the APR to that end." Mitsubishi again reserved the right to sell forklifts in plaintiff's APR to national accounts and other specified categories of customers, similar to those named in the prior agreement.
Mitsubishi's dealer development manager acknowledged that he repeatedly assured plaintiff that the elimination of Paragraph 3(d) served as a grant of exclusivity, in line with the company's policy and intent. Further, the reservation provision authorized Mitsubishi limited rights to sell directly to certain specified entities or categories of customers, but not to another dealer in plaintiff's APR. The general manager of Mitsubishi testified that Mitsubishi deleted Paragraph 3(d) from the form of agreement it was then using because the provision had always "raised questions" when signing new dealers, who he realized would "like to have a specific area where they didn't have to compete with another dealer."
During this same time frame, Mitsubishi asked plaintiff to become its new dealer in Connecticut. Plaintiff agreed on condition of being granted exclusivity. Plaintiff's principals formed Starlift Equipment Company, which, in December 1985, executed the same form of dealer agreement as plaintiff's 1985 agreement. Defendant never appointed a second Mitsubishi dealer in Starlift's territory, and it would later protect Starlift's exclusivity by imposing fees on a Massachusetts dealer for its encroachments and then crediting those amounts as Starlift earnings.
In 1988, a domestic forklift manufacturer filed a federal anti-dumping petition against Mitsubishi and other Japanese manufacturers. The resulting punitive tariffs and negative publicity hindered *514 plaintiff's efforts to promote the Mitsubishi brand. By 1990, Mitsubishi incurred substantial losses and decided to pursue a joint venture with Caterpillar to manufacture forklifts domestically and distribute them under both brands. Plaintiff feared that Mitsubishi dealers would no longer have a distinctive product line and would be poorly positioned to compete with the Caterpillar brand's iconic status. Plaintiff also feared that the joint venture would disadvantage Mitsubishi's sales to national accounts in its APR, which accounted for nearly half of all Mitsubishi forklifts sold there. The joint venture formally began with the 1992 formation of defendant. Mitsubishi and Caterpillar forklifts were manufactured side-by-side, with minor differences in design details and warranties.
Plaintiff believed that defendant gave the Caterpillar brand certain marketing advantages, including a longer warranty, guaranteed free parts if not immediately available, and dealer discounts. Further, under the joint venture, shipments of forklifts to dealers were often delayed and the units were of lower quality than previously. Mitsubishi was initially unresponsive to complaints about these problems.
As a result of these events, plaintiff added another product line. In February 1992, it entered into a dealer agreement with Toyota. Its APR was the nine most northeasterly counties of New Jersey, the same as its Mitsubishi APR minus Sussex, Warren and Hunterdon counties. Plaintiff was given a nonexclusive right to sell Toyota forklifts in that APR. Plaintiff was obligated to "actively and effectively" promote the sales of Toyota products in its APR, to "organize and maintain a qualified and trained sales organization," and "to establish and enforce effective policies to solicit all actual and potential customers" within its APR. The phrase "best efforts" appeared only once in the agreement, requiring Toyota to use its best efforts to provide plaintiff with sufficient quantities of its products.
Defendant was well aware that plaintiff took on the Toyota line. Plaintiff did not establish separate sales forces for Mitsubishi and Toyota, and this was also known to defendant. Plaintiff's policy was that its sales persons would show whichever brand the customer requested. Plaintiff's records revealed that it sold 200 Mitsubishi forklifts at an average price of $17,000 to "Toyota customers," while selling sixty-eight Toyota forklifts at an average price of $18,629 to "Mitsubishi customers." Toyota was considered the industry innovator, with features such as anti-tipping and load-leveling systems that customers quickly came to view as necessary. Plaintiff incorporated a greater profit on Toyota forklifts in order to give the Mitsubishi brand a general price differential to help offset Toyota's superior brand recognition.
Defendant gave plaintiff an "outstanding sales achievement" award for 1992, marking its full satisfaction with defendant's sales. In 1993, defendant proffered a new form of agreement to plaintiff that would have eliminated its exclusivity. The new form would also have required plaintiff to drop the Toyota brand if it failed to maintain a market share in its APR equal to Mitsubishi's national market share. Plaintiff refused to sign it. At the end of 1993, and again in 1994, plaintiff received from defendant additional "outstanding sales achievement" awards.
In 1995, in an ostensible effort to assist plaintiff in increasing its market share of Mitsubishi sales, defendant granted plaintiff a 50% price discount instead of its standard 48% discount, on the condition that plaintiff order 100 more units, which increased the marketing plan from 110 to 210 units. Defendant's employees expected that the revised plan would require *515 plaintiff to focus its efforts on the Mitsubishi brand, to the detriment of its Toyota sales.
In August 1997, defendant informed plaintiff that its 3.5% market share for Mitsubishi during the last three years was "substantially less" than Mitsubishi's national average market share of 6%. Because plaintiff's APR was the seventh largest among Mitsubishi's sixty-nine United States dealers, defendant claimed it was essential that plaintiff match the national average. Plaintiff was asked to meet with defendant's regional managers "to develop a plan to increase your share of market to an acceptable level in a reasonable amount of time." Plaintiff was informed that if it failed to "make satisfactory progress toward this goal within a reasonable timetable, we will begin to explore other means by which to achieve increased market penetration" in plaintiff's APR.
Plaintiff contended that the 3.5% figure for its market share was artificially low because it incorporated all sales in the APR, including national accounts. If they were excluded, plaintiff's share of the remainder would be greater than 6%. According to Raymond Picarillo, in 1992, for example, Mitsubishi sold only two forklifts to those national accounts, while Caterpillar sold many more. He said, "It was non existent national accounts with Mitsubishi. They put Caterpillar in New Jersey but never Mitsubishi." Therefore, plaintiff contended it was unfair to blame the dealer for a low market share when the effects of the national accounts, which were beyond the dealer's control, were included and skewed the results.
In 1998, defendant continued to insist that plaintiff increase its market share. Defendant expressed its intention to arrange a meeting to review the 1998 marketing plan, followed by quarterly reviews for "mutual accountability." Defendant continued to express the same complaints in 1999. It advised plaintiff that in the absence of a "discernible improvement" in its "unsatisfactory" level of market share, a meeting would be arranged "to discuss a dealer change in your APR."
By June 1999, defendant developed the concept of a "platform dealer," which would involve the regional consolidation of dealers and APRs. Larry Wuench, defendant's executive vice president, testified that defendant wanted "fewer, larger, better capitalized dealers," but that it had no intention to exclude nonparticipating dealers, who could continue to operate. The southern New Jersey Mitsubishi dealer was a potential platform dealer for all of New Jersey, Delaware, Maryland, eastern Pennsylvania and Washington, D.C.
Wuench's June 10, 1999 internal email stated that such arrangements would "have us terminate Maintainco (on the basis that we have a new dealer orgn. structure that does not include them) and get on with killing our competitors in the Phil[.]-Newark/NY areas." Internal emails from December 1999 discussed further preparations for a northeast platform dealer. Wuench solicited "preliminary thoughts, as well as what we might, in this scenario[,] be able to do about Maintainco." Although there was concern that the region might lack a sufficiently strong Mitsubishi dealer for the platform role, Wuench suggested consolidating some dealers, but not plaintiff: "I think we MIGHT be better off to go ahead and roll up some Mit[.] dealers (I'm still struggling with how to `ditch' Maintainco in all of this.) in the NE, [and] then approach" some Caterpillar dealers.
Wuench knew that New Jersey franchise law would prevent termination, so he "was still hoping at that point to be able to convince [plaintiff] to go off and do something else," like volunteer to become solely *516 a Toyota dealer. "[W]hat I meant by that was how to tell Maintainco to either decide to be a hundred percent committed to us or to decide to do a hundred percent something else." Defendant's executives acknowledged that they "understood it was going to be difficult" to terminate plaintiff's franchise under New Jersey law.
On January 5, 2000, Wuench wrote to plaintiff. He said he perceived a "lack of long term commitment" to Mitsubishi. He then stated:
In my opinion this latest situation is merely a symptom of the larger issue. Maintainco and [defendant] have never been able to develop a reasonable working relationship. I think it's time for both companies to examine other options.
To that end it's my intent to ask our people to begin a search for another dealer to represent Mitsubishi products in Northern New Jersey. Meanwhile I'd ask you to continue to perform on our behalf at least to the level you have to date. Further, recognizing that your primary demonstrated interest in our relationship has been on the parts side, I'm prepared to continue selling Mitsubishi parts to Maintainco for a year after any new Mitsubishi dealer is appointed.

[Emphasis added.]
Wuench acknowledged that a dealer could not function after a manufacturer stopped selling parts, because the resale of parts account for a significant part of a dealer's profits, and parts from alternative suppliers are less profitable. He claimed that his offer to sell parts for just one year was merely a "suggestion" that plaintiff resign as a Mitsubishi dealer.
In his January 10, 2000 emails to four northeast dealers that were to be included in the platform dealership, Wuench commented that "one of the keys to having a successful roll-up in your area is figuring out what to about Maintainco." Defendant later abandoned the platform dealer plan, recognizing that defendant could not fund it or convince dealers to pursue it at their own expense.
On March 16, 2000, plaintiff advised defendant that it would not accept termination or any other action to undermine its market share and profits. The next day, defendant's general sales manager sent a confidential internal email with the instruction, "Do not send any Business Plan evaluation to Maintainco for any reason, especially in writing."
In an internal memo in June 2000, Wuench again noted that New Jersey law prevented defendant from terminating plaintiff "even though they represent Toyota and only have about 2% market share for us." Defendant decided to appoint a second dealer in plaintiff's territory. Wuench acknowledged this would be the first time defendant had two dealers for the same brand in the same territory. On July 13, 2000, defendant and Mid-Atlantic Handling Systems (Mid-Atlantic) entered into a letter of intent for Mid-Atlantic to be a Mitsubishi dealer in plaintiff's APR. It provided that Mid-Atlantic would "not seek or solicit business from any customers currently served by another Mitsubishi dealer." Sales goals of 5% market share in 2001 and 8% in 2002 were set. Additional terms gave Mid-Atlantic a competitive advantage over plaintiff. Defendant did not inform plaintiff of this action. Plaintiff learned of it from a customer. Plaintiff believed it had been effectively terminated as defendant's franchisee.
On September 12, 2000, plaintiff brought this action against defendant for terminating its franchise in violation of the *517 Act and for breaching the dealership agreement.
On November 1, 2000, Wuench drafted an announcement letter to "Dear Valued Forklift Customer," naming Mid-Atlantic "as our newest Mitsubishi forklift truck dealer" and as "a supplier of Mitsubishi forklift trucks in northern and central New Jersey." It stated that "[a]ll current users of Mitsubishi forklift trucks can contact Mid-Atlantic" for warranty and maintenance and, "[w]e invite you to contact Mid-Atlantic Handling Systems for all your material handling needs." On January 2, 2001, Mid-Atlantic sent a copy of that letter to all customers in its database, which included plaintiff's customers. The letter went to thousands of entities in northern New Jersey. Plaintiff experienced declines in its sales, parts, rental and service business. Plaintiff took the letter's failure to mention it as another dealer in the APR as confirmation that defendant had terminated it.
Mid-Atlantic was not a solid or reputable company. In a September 21, 2001 internal email, defendant's assistant treasurer wrote that Mid-Atlantic "abuse[s] every accommodation we give them to meet our mutual needs.... They are sold out of trust for 116 units, i.e. they STOLE them." Notwithstanding these severe deficiencies in Mid-Atlantic's conduct and performance, on January 1, 2003, defendant entered into a one-year dealer agreement with Mid-Atlantic. The agreement obligated Mid-Atlantic to "use its best efforts to achieve the highest sales performance in its service territory reasonably achievable." It did not prohibit Mid-Atlantic from representing other manufacturers. And, if Mid-Atlantic maintained a market share equal to Mitsubishi's national average, defendant would "not appoint any other dealer to the service territory." On May 29, 2003, Mid-Atlantic filed for bankruptcy.
At trial, defendant presented John Marks, an expert in sales management and marketing. He opined that the industry practice was for dealers to have "a single primary line that they grow and support with their best efforts." Marks was of the view that the term "best efforts" was common in the industry, and it was understood to mean that "the dealer is going to put forward their best commercial efforts in terms of generating sales for that product." He said that for a multi-line dealer, as a practical matter, "[t]here is always a primary line." Therefore, he opined that "best efforts" required the dealer to take every opportunity to convert customers of its second line to its primary line, and it was inherently impossible for a dealer to render best efforts for more than one brand.
Defendant also produced an expert in industrial organization, Steven Schwartz. He opined that the decline in plaintiff's market share for Mitsubishi to less than the national average, especially as contrasted with the increase in Toyota market share to more than the national average, demonstrated that plaintiff had shifted its attention from Mitsubishi to Toyota.
Plaintiff presented Sally Hoffman, an accountant, as a damages expert. She calculated plaintiff's lost profits at $66,000 for lost sales of new equipment, plus $668,000 for lost parts sales and service work. These losses were based on sales made by Mid-Atlantic, which should have been plaintiff's, and a projection that plaintiff would have continued its history of servicing the majority of the forklifts it sold for the remainder of their average working life of twelve years. Defendant's accounting expert, David Tantlinger, disagreed. He asserted that a general industry decline during the period affecting all manufacturers, including Toyota, as well as the *518 encroachment by Mid-Atlantic, would have affected plaintiff.

II
[Part II omitted at the court's direction. See n. 1, supra.]

III
We next address the constructive termination issue. It is a violation of the Act "for a franchisor directly or indirectly through any officer, agent, or employee to terminate, cancel or fail to renew a franchise without good cause." N.J.S.A. 56:10-5. "Good cause" is defined as "failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise." Ibid. The only express limitation on the franchisor's requirements is that the franchisor may not "impose unreasonable standards of performance." N.J.S.A. 56:10-7(e).
The trial court found that defendant's conduct was geared to terminating plaintiff's franchise, and, but for plaintiff's filing of this action, defendant would have succeeded. With respect to this issue, defendant invites us to "accept arguendo that [it] expressed a desire to be rid of Maintainco; that it appointed Mid-Atlantic as a second dealer hoping to `destroy' Maintainco's franchise; or even that these acts would have breached the Agreement."
Defendant argues that the Act prohibits only actual termination, and, because plaintiff was never terminated, there was no violation. Defendant argues that the Act does not contemplate the concept of constructive termination as a violation. The trial court disagreed. It found that defendant's conduct was geared to terminating plaintiff as a franchisee, and, indeed, its January 5, 2000 letter to plaintiff was a termination letter. The record establishes that defendant's officers were well aware that the Act prohibited them from terminating plaintiff unless they could establish good cause. Their efforts to create the appearance of substantially deficient performance by plaintiff, i.e. good cause, failed. Their conduct was therefore geared to forcing out plaintiff. The court found that defendant's effort was thwarted only by virtue of plaintiff's filing of this action, and that defendant's conduct constituted an impermissible constructive termination. We agree.
The Act is remedial legislation. Kubis & Perszyk Assocs. v. Sun Microsystems, Inc., 146 N.J. 176, 193, 680 A.2d 618 (1996). Its objectives are "protecting franchisees from the superior bargaining power of franchisors and providing swift and effective judicial relief against franchisors that violate" its provisions. Ibid.
A franchisee may seek recovery for any harm it suffered "by reason of any violation of this act." N.J.S.A. 56:10-10. For any claim, the franchisor may assert as a defense that "said franchisee has failed to substantially comply with requirements imposed by the franchise and other agreements ancillary or collateral thereto." N.J.S.A. 56:10-9. See, e.g., Dunkin' Donuts v. Middletown Donut Corp., 100 N.J. 166, 171-73, 495 A.2d 66 (1985) (franchisee's deliberate underreporting of sales, which it refused to cure, was a material breach justifying termination); Simmons v. Gen. Motors Corp., 180 N.J.Super. 522, 539-41, 435 A.2d 1167 (App.Div.) (sale by car dealer of its franchise without the required notice or permission of the manufacturer-franchisor to a purchaser with a bad reputation "who was justifiably found unacceptable to the franchisor ... constituted a `substantial breach' of [the franchisee's] obligations under the franchise agreement," and thus provided statutory grounds for termination), certif. denied, 88 N.J. 498, 443 A.2d 712 (1981); Gen. Motors *519 Corp. v. New A.C. Chevrolet, 91 F.Supp.2d 733, 738-41 (D.N.J.2000) (addition by Chevrolet dealer of a Volkswagen franchise at its premises without permission of the manufacturer-franchisor constituted failure of substantial compliance with the agreement's reasonable terms, justifying termination), aff'd, 263 F.3d 296 (3d Cir.2001).
By contrast, plaintiff did not fail to substantially meet the performance requirements imposed by its agreement. Defendant did not have good cause to terminate plaintiff, and it knew it. That is why, rather than directly and unambiguously terminating plaintiff, it engaged in a course of conduct geared to forcing out plaintiff.
In the absence of a substantial failure of franchisee compliance, the statutory requirement of "good cause" prohibits a franchisor from terminating for other reasons, even if they reflect a sound and nondiscriminatory business strategy. Westfield Centre Serv., Inc. v. Cities Serv. Oil Co., 86 N.J. 453, 460-61, 432 A.2d 48 (1981). Accord Cooper Distributing Co. v. Amana Refrigeration, Inc., 180 F.3d 542, 545 (3d Cir.1999). In Westfield, supra, 86 N.J. at 465-66, 432 A.2d 48, the Court held that the Act did not preclude nonrenewal for a good faith business reason, but falling short of good cause, the franchisor would be required in those circumstances to pay the franchisee the reasonable value of its business. Thus, a franchisor acting in good faith for a bona fide business reason who terminates or fails to renew a franchise "for any reason other than the franchisee's substantial breach of its obligations has violated N.J.S.A. 56:10-5 and is liable to the franchisee for the loss occasioned thereby, namely the reasonable value of the business less the amount realizable on liquidation." Id. at 469, 432 A.2d 48.
The Legislature's decision not to recognize a valid business reason as "good cause" for termination distinguishes the Act from the less-protective franchise statutes in other states. For example, in Petereit v. S.B. Thomas, Inc., 63 F.3d 1169, 1185-87 (2d Cir.1995), cert. denied, 517 U.S. 1119, 116 S.Ct. 1351, 134 L.Ed.2d 520 (1996), the Second Circuit observed that an amendment to Connecticut's statute eliminated its equivalence to N.J.S.A. 56:10-5 by altering the definition of "good cause" to include "a franchisor's legitimate business reasons" as well as a franchisee's material breach of the agreement.
In this case, Wuench asserted that the new performance standard for multi-line dealers of matching Mitsubishi's national market share was a test of whether they were "a hundred percent committed to us." It was also a signal that, if they were not so committed, they should "decide to do a hundred percent something else." However, even if defendant really was applying that new standard to all multi-line dealers for a valid business purpose, its absence from plaintiff's agreement meant that plaintiff's failure to satisfy it would not have been good cause for termination.
The cases discussed above involved an actual termination, or an attempted termination that was prevented only by legal action. They did not address potential liability of a franchisor under the Act for a constructive termination. Defendant provides no persuasive authority to support its argument against liability for constructive termination.[3]
*520 The Act accommodates the common law of contract to some extent, by recognizing the validity of all reasonable standards of performance to which the parties may have agreed and the franchisor's right to enforce substantial compliance with them. N.J.S.A. 56:10-5, -7(e), -9. The doctrine of constructive termination is also part of contract law, rather than a statutory invention. See, e.g., Daniels v. Mut. Life Ins. Co., 340 N.J.Super. 11, 17-18, 773 A.2d 718 (App.Div.) (noting that unlike express termination, constructive discharge occurs when a reasonable employee feels compelled to resign because of an employer's conduct, certif. denied, 170 N.J. 86, 784 A.2d 719 (2001)). And, the Act prohibits a franchisor from "indirectly" terminating a franchise without good cause. N.J.S.A. 56:10-5.
In addition to arguing that constructive termination is not actionable under the Act, defendant contends it did not act to commit a constructive termination. We agree with the trial court's finding that this contention is disingenuous. Defendant's letter of January 5, 2000 was a declaration of intent to terminate plaintiff once defendant found a new dealer. Defendant's later assertion that the letter was merely a suggestion was an obvious revision of history. Wuench admitted that stopping the sale of forklifts and parts would have ended plaintiff's Mitsubishi business. Defendant's decision to stop providing annual business plans was further evidence that it expected to abandon plaintiff in favor of another dealer. The court was therefore correct to find that such conduct, headed off only by judicial action, would have terminated plaintiff's franchise.
We reject defendant's position that if plaintiff wanted to claim damages under the Act for termination it was required to withdraw from the agreement and thus allow itself to be "terminated." Such a requirement would fly in the face of the Act's purposes of leveling the playing field between the typically more powerful franchisor and less powerful franchisee, and providing measures to protect franchisees from oppressive conduct by franchisors. Kubis, supra, 146 N.J. at 193, 680 A.2d 618. We conclude that "termination" in the Act includes constructive termination in accordance with traditional contract law principles. To conclude otherwise would undercut the remedial purposes of the Act by allowing a franchisor to engage in such blatant attempts to "ditch," or constructively terminate, a franchisee, but escape liability under the Act because it did not entirely succeed.
Whether the loss of exclusivity, in and of itself, qualifies as constructive termination is another question that has not been decided in New Jersey. However, a New York federal court applying New Jersey law found that it can be. Carlos v. Philips Bus. Sys., 556 F.Supp. 769, 774-76 (E.D.N.Y.), aff'd, 742 F.2d 1432 (2d Cir. 1983). In Carlos, the franchisor had a "two tier marketing system consisting of dealers and exclusive distributors." Id. at 770. The plaintiff started as a dealer and then became an exclusive distributor for southern New Jersey. Id. at 770-71.
The District Court held that, for a franchisee that actually enjoys a contractual right of exclusivity, the franchisor's offer to renew only if the franchisee agrees to become a nonexclusive dealer is not merely a "change" in the agreement's terms. Id. at 775-76. It found that the franchisor intended "to streamline its marketing system by eliminating exclusive distributors... in order to more profitably exist in a changing marketplace," and that the supposed "change" was "essentially a termination or failure to renew this distributorship agreement." Id. at 776. We agree *521 with this reasoning. The "change" that defendant proposed for plaintiff upon Mid-Atlantic's appointment would have gone even further, because instead of simply establishing Mid-Atlantic as a second dealer in the territory, defendant would have eliminated plaintiff as a dealer by ending its ability to purchase new forklifts and parts.
In Petereit, supra, 63 F.3d at 1181, the Second Circuit applied the original version of the Connecticut statute, which "provides a franchise may be terminated only for good cause and in accordance with certain notice requirements." (Carlos noted that the original version was "virtually identical" to N.J.S.A. 56:10-5. Carlos, supra, 556 F.Supp. at 776.) Under that statutory language, changes to the boundaries of a dealer's exclusive territory might be a termination without good cause even if they would not amount to constructive termination at common law. Petereit, supra, 63 F.3d at 1181-82.
The Second Circuit rejected the proposition "that any negative impact on franchise income resulting from the franchisor's realignment of territories is alone sufficient to be deemed a termination." Id. at 1182. Instead, it required the franchisor's action to "result in a substantial decline in franchisee net income." Id. at 1183. The loss of exclusivity would be prohibited only if it were likely to cause or contribute to such a decline. See ibid. The Second Circuit relied in part on the remedial purpose of Connecticut's statute in holding that Connecticut courts would apply it to constructive terminations, and the opinion does not suggest that constructive termination should be determined under different standards than those of contract law. Id. at 1181-83.
In this case, defendant's conduct proved defendant's intent for the cessation of exclusivity to undermine plaintiff's franchise. Defendant attempted to establish Mid-Atlantic as the only viable dealer in the territory. Defendant let Mid-Atlantic begin operating as a dealer on the strength of just a letter agreement, more than two years before it entered into a proper dealership agreement. Defendant appointed Mid-Atlantic and blanketed plaintiff's territory with the message that Mid-Atlantic was its favored Mitsubishi dealer in all regards, without informing plaintiff. It provided discounts, rebates, and other subsidies that let Mid-Atlantic undercut plaintiff's prices. It showed unique forbearance in letting Mid-Atlantic continue to buy forklifts without paying for them, to "steal" them, and it continued indulging Mid-Atlantic by trying to assist its reorganization after it went bankrupt.
Defendant further demonstrated the strength of its intention to make plaintiff resign after losing exclusivity, by developing the platform strategy in response to its realization that New Jersey law forbade termination of a dealer with satisfactory performance. It proposed various arrangements to many of the major Mitsubishi and Caterpillar dealers in the northeast, keeping them secret only from plaintiff, whose exclusion was the one constant element. It then pursued the platform strategy for years with little progress, until it had to admit the impossibility of financing it. Wuench all but admitted that his various "suggestions" that plaintiff demonstrate absolute commitment to the Mitsubishi brand were actually statements that plaintiff should resign to spare defendant the trouble of termination.
In sum, New Jersey franchise law would have allowed defendant to terminate plaintiff's franchise only if it had "good cause" consisting of plaintiff's failure substantially to perform its contractual obligations. Defendant was otherwise powerless to terminate plaintiff, no matter what good business *522 reasons it may have had for seeking arrangements that did not respect plaintiff's contractual rights. The record supports the trial court's finding that defendant would have terminated plaintiff's franchise but for this litigation, and that defendant's conduct violated the Act.

IV
Finally, we address defendant's arguments regarding damages, attorney's fees, and expert fees. A successful claimant may "recover damages sustained by reason of any violation of this act." N.J.S.A. 56:10-10. It is also "entitled to the costs of the action including but not limited to reasonable attorney's fees." Ibid.
[Subparts A. and B. omitted at the court's direction. See n. 1, supra.]

C.
Whether the Act authorizes awards of expert fees is an issue of first impression. Generally, "litigants bear their own expenses for fees and costs, except where specifically authorized by statute, rule, or agreement." Josantos Constr. v. Bohrer, 326 N.J.Super. 42, 47-48, 740 A.2d 653 (App.Div.1999). We disallowed expert fees in Josantos, holding that the authorization in the Consumer Fraud Act for awards of "reasonable costs of suit," N.J.S.A. 56:8-19, did not encompass expert fees. Ibid. Noting N.J.S.A. 39:6A-34 (expert fees recoverable in de novo trial following rejected automobile arbitration award) and N.J.S.A. 54:51A-22 (expert fees recoverable as litigation costs by prevailing taxpayer) as examples in which the Legislature expressly authorized expert fees, we reasoned that "[w]hen the Legislature intends the recovery of expert fees, it is perfectly capable of saying so explicitly." Id. at 48, 740 A.2d 653. We recognized that the frivolous litigation statute, N.J.S.A. 2A:15-59.1, which allows awards of "all reasonable litigation costs," arguably encompasses expert fees, relying on the Legislature's use of the term "litigation costs" as including expert witness fees in N.J.S.A. 54:51A-22. Ibid.; see Weed v. Casie Enter., 279 N.J.Super. 517, 533, 653 A.2d 603 (App.Div.1995).
Similar reasoning has led to denial of awards of expert fees to prevailing plaintiffs under the no-fault auto insurance statutes. Velli v. Rutgers Cas. Ins. Co., 257 N.J.Super. 308, 309-10, 608 A.2d 431 (App. Div.), certif. denied, 130 N.J. 597, 617 A.2d 1220 (1992); Helton v. Prudential Prop. & Cas. Ins. Co., 205 N.J.Super. 196, 204, 500 A.2d 717 (App.Div.1985).
Our State's jurisprudence on this subject has been marked by a strong adherence to the general prohibition of expert fee awards in the absence of manifest statutory authority. The wording in the Act, "the costs of the action," does not provide a clear statement of legislative intent to allow expert fees.
We are mindful of the Supreme Court's comment in Westfield that "the attorneys' fees provision encourages private enforcement of the Act by franchisees who might otherwise be deterred from instituting meritorious suits and furthers the legislative intent to make franchisees economically whole." Westfield, supra, 86 N.J. at 471-72, 432 A.2d 48 (emphasis added). However, the Court there was referring to the distinction between legislative authorization for successful franchisees, but not franchisors, to collect whatever attorney's fees the Act happens to provide. "Economically whole" was simply the Court's characterization of the Legislature's intention, and we cannot stretch the term to include elements of recovery that the Legislature has not expressly authorized.
The Legislature has struck a balance, modifying the general American rule *523 that requires each party to pay its own litigation costs by allowing a successful franchisee in an action under the Act to recover from the franchisor a substantial portion of its litigation costs. This includes reasonable attorney's fees, as awarded here, and those costs that have been traditionally included as reasonable out-of-pocket expenses incurred by the attorney that are normally charged to a fee-paying client, such as photocopying, paralegal expenses, travel and telephone costs, and the like.[4]See Helton, supra, 205 N.J.Super. at 201 n. 3, 500 A.2d 717. As we stated in Velli, such a balance "is neither compelled nor condemned by any legal doctrine." 257 N.J.Super. at 313, 608 A.2d 431. Nevertheless, "it is a balance which we are loathe to upset in the absence of indications either that it has worked inequity or that it does not satisfy the Supreme Court or Legislature." Ibid.
Accordingly, we reverse that portion of the trial court order awarding attorney's fees and costs by reducing the amount awarded for costs by $477,611.46, representing expert fees.
Affirmed as modified in part; reversed in part.
NOTES
[1] Because they do not meet the guidelines for publication, see R. 1:36-2(d), the following portions of this opinion are omitted from the published version: Part II, in which we upheld the trial court's findings that (1) plaintiff did not breach its best efforts obligation, (2) the 1985 contract granted plaintiff exclusive dealership rights, and (3) by appointing Mid-Atlantic, defendant breached the contract; and Part IV A and B, in which we upheld the trial court's damage award (as modified to correct a calculation error) and counsel fee award.
[2] Defendant does not dispute responsibility for the conduct of all of its predecessors, and we refer to them all in this opinion generically as "Mitsubishi." Defendant is a joint venture entity between Mitsubishi and Caterpillar, which we will explain further in this opinion.
[3] Defendant relies upon cases decided under the federal Petroleum Marketing Practices Act. These cases are not on point.
[4] Indeed, in this case, in addition to the very substantial attorney's fee, the other costs awarded, which defendant does not dispute, include (in rounded off amounts): travel ($26,000), computerized research ($46,000), phone/copy/postage ($20,000), duplication/reproduction/scanning costs ($29,000), discovery master fees ($55,000), and transcript/court reporter fees ($63,000).